(No. 6572. October 4, 1938.)

EAGLE ROCK CORPORATION, a Corporation, Substituted as Plaintiff in Place of MOUNTAIN STATES BUILDING & LOAN ASSOCIATION, a Corporation, Respondent, v. IDAMONT HOTEL COMPANY, a Corporation, GEORGE A. HUSKINSON, ARTHUR PORTER, HUGH A. WRIGHT, H. E. POOLE, M. C. RIGBY, D. H. CLARK and JOHN BUCKMILLER, Appellants.

[85 Pac. (2d) 242.]

414

W. A. Ricks and Merrill & Merrill, for Appellants.

Otto E. McCutcheon, for Respondent Eagle Rock Corporation.

418

W. Lloyd Adams and Mary Smith, for Respondent Skelton.

BUDGE, J.—May 29, 1928, appellants executed and delivered a mortgage upon a three-story hotel building and certain personal property to Mountain States Building & Loan Association to secure the payment of a promissory note providing:

"For value received, I, we, or either of us promise to pay . . . . the sum of Seventy-seven thousand two hundred ten and 40-100 dollars, ($77,210.40) in one hundred twenty (120) installments of six hundred forty-three and 42-100 dollars ($643.42), payable on or before the 15th day of each and every month, commencing with the month of July, 1928, the same being as and for a payment on account of the principal sum of a loan of fifty-three thousand and no-100 Dollars ($53,000.00) obtained from said Association, and the proportion of twenty-four thousand two hundred ten and 40-100 Dollars ($24,210.40) interest thereon, which may have accrued on the balance of said principal sum remaining unpaid at the date of the last installment payment, said sum of twenty-four thousand two hundred ten and 40-100 Dollars ($24,210.40) being the total interest for said period of 120 months upon said principal sum, calculated upon unpaid monthly balances at the rate of eight (8) per cent per annum, which rate of interest the principal sum bears from date until paid. . . . . "

The mortgage given to secure the foregoing note contained the following provisions among others:

"This mortgage is given to secure the payment of a note of even date herewith according to its covenants for the gross sum of Seventy-seven Thousand Two Hundred Ten and 40-100 Dollars, to be paid in monthly installments of Six Hundred Forty-three and 42-100 Dollars, each, commencing on the 15th day of July, 1928, and to continue to make and pay the said monthly installments on the 15th day of each and every calendar month thereafter succeeding, until One Hundred Twenty (120) installments have been fully paid, all in accordance with the conditions of said note. And these presents shall be void if such payments shall be made. But if default be made in the payment of any installment or any part thereof, for a period of sixty days after it is due, or in respect to any other covenant, condition or agreement in this mortgage contained, then in case of any such default, the whole sum advanced as principal less the payments made on the principal, shall thereupon without notice immediately become due and payable and suit may thereupon be brought for the foreclosure of this mortgage. . . . . ''

The mortgage further provided for payment of taxes, liens and insurance by the mortgagor, and in case of default in such payments that the mortgagee might pay the same, such payments made by the mortgagee to be secured by the mortgage. Specifically with reference to the payment of interest the mortgage provided as follows:

"It is expressly provided that in no event shall interest be charged, paid, or received directly or indirectly, on the sum advanced and which this mortgage is given to secure to exceed the rate of eight per cent per annum before maturity, and ten per cent per annum after the maturity or due date of any installment or the whole of the principal."

"And in order to ascertain the amount unpaid it is hereby conditioned that all installments heretofore paid by said first party to second party after deducting therefrom interest at the rate of eight (8) per cent per annum on the amount of the sum so advanced and which may be found to be unpaid on the 15th day of each and every calendar month commencing with the month of July, 1928, shall be deemed to be payments on the principal sum advanced. In the event of de-

fault in the payments hereby secured, the same provision shall be adopted in order to ascertain the balance then owing and unpaid on the note, except that interest at the rate of 10 per cent per annum shall be paid after the debt matures.''

Appellants defaulted in the payment of certain taxes and the monthly payments and this action was instituted by respondent, Mountain States Building & Loan Association, the Eagle Rock Corporation being thereafter substituted therefor, for the foreclosure of the mortgage. Among other things the answer of appellant Idamont Hotel Company, a corporation, admitted that it made, executed and delivered the promissory note described in the complaint for the sum of $77,210.40, admitted the note provided for interest at the rate of 8 per cent per annum, but denied that 8 per cent per annum was the correct rate of interest provided for in such note and alleged that the note bears interest at the rate of 11 5/16 per cent per annum.

Respondent Clyde Skelton, alleged by the complaint to claim some interest in the mortgaged property, by cross-complaint sought to quiet title to the second and third stories of a building upon lands of Skelton, consisting of rooms used by the hotel company, and sought to be declared and adjudged the owner of an easement consisting of a passageway as a means of ingress and egress through the lobby of the Idamont Hotel building to the commencement of the stairway leading to the second and third floors and a passageway over said stairway and through the main halls of both the second and third floors for the use of the general public in passing to and from the premises of respondent Skelton.

The court made findings of fact and conclusions of law and entered a decree in favor of respondent Eagle Rock Corporation for the foreclosure of the mortgage according to its terms and in favor of respondent Clyde Skelton to the effect that as to the second and third floors of the building erected on the property of Skelton the Idamont Hotel Company possesses the right to enter the second and third floors of said building so long as the said building shall exist at such reasonable rental as may be agreed upon between the parties, and ordering, adjudging and decreeing respondent Skelton to be

the owner in possession and entitled to the possession and use of an easement or right of way through and over the portions of the Idamont Hotel building above referred to. This appeal was taken from the judgment.

Two main questions are presented, appellants urging that the contract is tainted with usury, and secondly that the court was in error in adjudging respondent Skelton to be the owner of an easement.

Appellants contend that while it is made to appear from the contract that the principal sum loaned by the predecessor of respondent Eagle Rock Corporation was $53,000, that on the same day credit for such amount was given appellants the sum of $1855 "commission" and "membership fee" was deducted, and that such amount was not properly chargeable against appellants, was purely for respondents' benefit and must be considered as an advance payment of interest and thus appellants in actuality received but $51,145. By appellants' calculation,—from the date the loan was made to the time of default by appellants, and not for the entire term of 120 months provided by the contract, it is made to appear that the interest rate was in excess of 10 per cent per annum.

There appears to be no claim made that compound interest was charged. Upon its face the contract does not disclose that interest was contracted for in excess of 10 per cent per annum either before or after maturity. It also appears that in order to show that interest exceeded 10 per cent per annum the deductions, or at least a part thereof, made from the principal sum of $53,000 must be considered as advance interest payments. It is thus urged by appellants that the sum of $1855, deductions and exactions, constitute a disguise attempted to be used to shield the transaction from usury. Of this amount $795 was charged to commissions. The court found:

"That in disbursing the funds representing the proceeds of the loan made by the mortgagee to the mortgagor, $397.50 was paid to the Eastern Idaho Loan & Trust Company as a commission, and $397.50 was paid to D. W. Stowell as a commission, and said payments were made at the request of the

Hotel Company, and no portion of said sums were received by the mortgagee or any employee thereof.''

The record does not disclose that any objection was ever made to the deduction or payment of these commissions until the time of the suit to foreclose. Appellants urge in support of their contention, in part, that C. H. Shattuck and the lender were one, which is not conclusive nor does it appear to have any particular bearing on the question. There is evidence that $397.50 deduction was made to cover commission to Mr. Stowell and $397.50 to cover commission to the Eastern Idaho Loan & Trust Company, and that the record of respondent Eagle Rock Company discloses that credits were given to these accounts and that such credits have all been offset. It was agreed that W. L. Shattuck was the manager of the Eastern Idaho Loan and Trust Company, a real estate firm in Idaho Falls, and that C. H. Shattuck (not the same person), was the secretary and manager of the Mountain States Building and Loan Association at the time the loan was made. No connection between W. L. Shattuck and C. H. Shattuck or between the Eastern Idaho Loan & Trust Company and the Mountain States Building & Loan Association appears from the record. There is nothing in the record to indicate anything other than that the commission was properly charged against appellants and credited and paid to the Eastern Idaho Loan & Trust Company and D. W. Stowell. There is evidence that the item of $1,060 was a charge made to cover a 2 per cent membership of the stock of the Mountain States Building & Loan Association, and that such was shown in the statement rendered to the Idamont Hotel Company at the time. Appellants do not urge, nor is there any evidence tending to show, that they did not receive stock in the Mountain States Building & Loan Association to the amount of the membership fee paid. On the other hand the mortgage discloses that 530 shares of stock of the Mountain States Building & Loan Association was pledged as collateral security for the mortgage. It does not appear from the record that the $1855 were improper deductions for the purposes named nor that the amounts must be

considered as additional payments of interest over and above the amount contracted for by the mortgage.

The rule which this court has announced and followed with respect to the. manner of determining whether usurious interest has been charged or collected is stated in *Easton v. Butterfield Live Stock Co.*, 48 Ida. 153, 279 Pac. 716, as follows:

''In determining whether usurious interest has been charged or collected under a particular contract *it is not permissible to consider only a portion of the term.* The test is, Did the lender under his contract charge or receive a profit on his investment in excess of the maximum rate for the full period of the loan? If he has, there is usury; otherwise not.'' (See annotation of cases 82 A. L. R., page 1214.)

The same method of calculation was used in *United States Building & Loan Assn. v. Lanzarotti*, 47 Ida. 287, 274 Pac. 630, cited in *Easton v. Butterfield Live Stock Co., supra.* The Easton case has been cited and affirmed in *Musser v. Murphy*, 49 Ida. 141, 286 Pac. 618, and *Patrick v. Bisbee*, 52 Ida. 369, 15 Pac. (2d) 730. To the same effect see *Low v. Sutherlin, Barry & Co.*, 35 Fed. (2d) 443. There appears to be no question that the interest on $53,000 payable as the note and mortgage herein provided and figured at the rate of 8 per cent per annum was correctly computed and amounted to $24,210.40 for the full term of 120 months. Under the law existing at the time the contract was made the parties might lawfully have contracted for the payment of interest not to exceed the sum of 10 per cent per annum. (Sec. 26–1905, I. C. A.) Simple computation discloses that interest at 10 per cent rather than at 8 per cent would increase the total amount of interest for the same term by the amount of one-fourth of $24,210.40, or by $6,052.60, which latter amount may be used as a yardstick or margin to determine whether the interest was usurious or exceeded the sum of 10 per cent per annum. Conceding, but specifically not so deciding, that the amount of $1855, deducted as ''commission'' ($795) and ''membership fee'' ($1,000) must be considered as an additional interest payment, and thus should be added to $24,210.40, it still appears that the total interest

would not amount to 10 per cent per annum computed over the entire term, but that a difference or margin of $4,197.60 would still remain between the interest actually contracted for and interest at the rate of 10 per cent per annum which might have been contracted for. In other words, interest at 8 per cent per annum for the total period of 120 months, or $24,210.40, plus $1855 (deducted by respondent), does not exceed the sum of 10 per cent per annum for 120 months.

In addition to the foregoing appellants further contend that the evidence shows that such loan was usurious for the full term of the contract because of the acceleration of interest clause brought into play by reason of appellants' default. That is, that the mortgage contract became a straight 10 per cent contract on September 15, 1928, and that such straight 10 per cent contract plus the $1855 charged as ''commission'' and ''membership fee'' swells the lender's return on his investment to such an extent that it exceeds the sum of 10 per cent per annum for the 120 months. It is to be remembered that the mortgage provides for 8 per cent before maturity, and 10 per cent after the maturity or due date of any instalment or the whole of the principal. It appears unquestioned that the sum due became subject to the increased rate of interest September 15, 1928, by reason of appellants' default, appellants in effect so conceding by the following statement appearing on page 10 of their brief:

''The mortgagee defaulted, and on September 15, 1928, the obligation became due because of the provision in the mortgage to the effect that if 'default be made in the payment of any installment, or any part thereof, for a period of sixty days after it is due, or in respect to any other covenant, condition, or agreement in this mortgage contained, then in case of any such default, the whole sum advanced as principal, less the payments made on the principal, shall thereupon without notice, immediately become due and payable and suit may thereupon be brought for the foreclosure of this mortgage and to sell the said premises or any part thereof in the manner prescribed by law to make the amount so due and payable.'

"So the mortgagee, in accordance with the terms of the mortgage, charged ten per cent per annum from September 15, 1928."

Appellants' line of reasoning appears to be to the effect that respondent knew before the contract was executed that appellants would default and therefore inserted the acceleration clause, thereby intending from the inception of the contract to charge the higher rate of interest. Such reasoning is not borne out by the record. A term of ten years was provided for by the contract for repayment. The contract provides "that in no event shall interest be charged, paid or received directly or indirectly, on the sum advanced and which this mortgage is given to secure to exceed eight (8) per cent per annum before maturity, and 10 per cent per annum after the maturity or due date of any installment or the whole of the principal." In addition it appears that there is evidence that $5,137.32 accumulated interest was remitted March 1, 1934, and thereafter the interest on principal sums was computed at 5 per cent per annum. There is nothing to indicate that respondent "knew" that appellants would default. There is nothing to indicate or suggest that the provision for a greater rate of interest after maturity or default was a device or contrivance to cover usurious interest. Only through appellants' own failure would or did the interest rate increase to 10 per cent and in such a case, where the borrower may by performance avoid liability for the payment of additional sums, the extra payment is not regarded as interest for use of the money but as a means to enforce punctual payment and as a penalty for default, and a contract providing for a higher or even excessive rate after maturity or default is not regarded as usurious. Deeming it unnecessary we express no opinion upon the question of the right to collect a penalty in a sum exceeding statutory interest. One of the first pronouncements by this court of the rule above referred to appears in *Broadbent v. Brumback*, 2 Ida. 366, 16 Pac. 555, wherein it was said:

"The appellants claim also that the attorney fee is but usury in disguise, and ought not to be allowed. In *Lloyd v. Scott*, 4 Pet. 205, 225, 7 L. Ed. 833, Justice McLean says:

'Where a party agrees to pay a specified sum, exceeding lawful interest, provided he do not pay the principal by a day certain, it is not usury.' This doctrine is adopted in *Cutler v. How,* 8 Mass. 257; *Tuttle v. Clark,* 4 Conn. 153; *Pollard v. Baylors,* 6 Munf. (Va.) 433; *Jones v. Hubbard,* 6 Call (Va.), 211; *Gower v. Carter,* 3 Iowa, 244, 66 Am. Dec. 71; *Shuck v. Wight,* 1 G. Greene (Iowa), 128; *Fisher v. Anderson,* 25 Iowa, 28, 95 Am. Dec. 761; *Rogers v. Sample,* 33 Miss. 310, 69 Am. Dec. 351; *Gambril v. Doe,* 8 Blackf. (Ind.) 140, 44 Am. Dec. 760; *Billingsley v. Dean,* 11 Ind. 331; *Lawrence v. Cowles,* 13 Ill. 577; *Sumner v. People,* 29 N. Y. 337; *Bank v. Curtiss,* 19 Johns. (N. Y.) 326; Taylor on Usury, 210.''

The rule is stated in *Easton v. Butterfield Live Stock Co., supra,* as follows:

''There is nothing in the case to suggest that the provision for a greater rate of interest after maturity was not made in good faith or was but a device or a contrivance to cover usurious interest. The duration of the loan disproves such intention. It is quite generally held that usury statutes apply only to unmatured contracts where the obligation of the borrower is definitely fixed. Under the quite unanimous declarations of courts and text writers neither the fact that the bonds bear a higher rate of interest after maturity, whether by expiration of time or declaration following default, nor the collection by the intervenor for a period of interest greater than the maximum allowed renders the contract usurious. Where the borrower may by performance of his contract avoid a liability for the payment of an additional sum, the extra payment is not regarded as interest for the use of money but as a means to enforce punctual payment and as a penalty for default. Where a debtor may relieve himself by payment or performance of his obligation according to its terms, a contract providing for a higher and even excessive rate after maturity or default is not regarded as usurious. (Cases.)''

In *Low v. Sutherlin, Barry & Co., supra,* which case cites *Easton v. Butterfield Live Stock Co., supra,* Judge Dietrich uses the following language:

"It will thus be seen that, if plaintiff had made the payments called for by the contract as evidenced by the bonds and the trust deed, in compliance with the terms thereof, the aggregate interest collected or collectible would and could not have exceeded the total amount which might have been legally charged (12 per cent), even upon the assumption that all the items in full going to make up the alleged $73,870. are subject to classification as interest. . . . . But construing the allegations most favorably to plaintiff, and assuming the payment of all other items, and further assuming that the 10 per cent. discount and the alleged bonus of $5,900. are to be treated as interest paid, there is still no usury, unless we hold that a transaction entirely legal upon its face, and contract nonusurious if complied with by the debtor, may be rendered by him usurious and illegal by his voluntary default in respect thereto. That a debtor cannot so bring his creditor under heavy penalties is too clear to admit of discussion, and the authorized acceleration of the maturity dates of the bonds does not render the transaction usurious."

It appears that in the instant case if appellant had made the payments as called for by the contract as evidenced by the note and mortgage and in compliance with the terms thereof the aggregate interest collected or collectible would not have exceeded the total amount which might have been legally charged.

With reference to respondent Skelton, appellants urge that Skelton failed to show he is entitled to an easement over and upon the property of the Idamont Hotel Company; that nothing more appears than a revocable license or permissive use, and that the alleged parol agreement is void.

The record discloses that respondent Skelton became the owner March 12, 1926, of certain property north of and immediately adjacent to the Idamont Hotel Company property, and that S. J. Skelton, predecessor in interest of respondent Clyde Skelton, and Hyrum Ricks, Jr., predecessor in interest of the Idamont Hotel Company, in the spring of 1916 made and entered into an agreement with relation to such properties which at that time were vacant and unoccupied and belonged to Ricks. The evidence discloses that Ricks was the

owner of certain tracts of land on College Avenue, which street Ricks desired to open up and develop and upon which he desired to build a hotel building. The plan conceived by Ricks and presented to Skelton, which plan was thereafter incorporated in an oral agreement and provided for in the plans and specifications for the building and which plan was carried out, provided that Ricks would sell Skelton a piece of land on College Avenue of the width which Skelton desired for the building of a market and for the erection of what may be termed a single building three stories in height upon said tracts, the cost thereof to be divided between the respective owners in proportion to the front footage on College Avenue of their respective tracts; that portion of the ground floor on Skelton's tract was to be occupied by him and used for the purpose of a retail meat market, the second and third floors were to be constructed as a part of the hotel building and as to conform to the plan agreed upon for the hotel building, so that the halls, room arrangement, etc., on the second and third floors of the entire building would be available for hotel use substantially as a single building; the plan provided for 12 rooms each on the second and third floors with lateral halls running east and west from the main north and south halls upon and over the land of Skelton, and also provided that the property line between the two tracts should run, as to the second and third floors, through the rooms on the south side of said lateral halls so that about 18 inches of each of said rooms, together with the northerly partition wall of said rooms, should be upon and over the land of respondent Skelton, the remainder of said rooms to be upon and over the land of Ricks (appellants). It was further suggested and agreed that the hotel owner should have the privilege of renting the second and third floors of that portion of the building over and upon Skelton's land at $10 per month rental for each floor. The evidence further discloses that the plan suggested and agreed upon and which plan was evidenced by the plans and specifications followed in erecting the building provided for a right to use the lobby of the hotel leading to the stairway near the center of the lobby, thence over the stairway to the second floor, thence through the main halls north-

erly to the rooms on the second floor directly over the Skelton land and through the lateral halls on the second floor, and the same as to the third floor, thus giving access from the street to the second and third floor rooms over the Skelton land. Such was the only means of entry to the second and third floor rooms over the Skelton property provided for. The agreement also provided for access to the roof over the Skelton portion of the building by stairways or ladderways from the third floor. The lobby, stairways and a portion of the necessary hallways providing means of entry to the Skelton rooms were over the Ricks land and in the Ricks (appellants) portion of the building. Twenty-one and one-half foot frontage was sold to Skelton, the deed therefor, signed and acknowledged by Ricks' wife, being given after the plan was presented and agreed upon. The building was constructed in 1917 in accordance with the verbal agreement and in accordance with plans and specifications embodying the essentials of the agreement. Skelton paid his proportionate share of the total cost of the entire building as agreed. No other stairways or space therefor for ingress and egress to the second and third floors of the Skelton portion of the building were provided for, either in the plans and specifications or in the building as built. The right of way provided for has been used continuously in the manner above set forth since the construction of the building and the Idamont Hotel Company and its predecessors have continuously rented the rooms over and above the Skelton land and use the same as a part of the hotel.

It is urged by appellants that the interest of a wife in community property is so vested in her that the husband cannot deprive her of it by voluntary alienation without she sign and acknowledge the written instrument purporting to transfer the estate, and that therefore the oral agreement between Ricks and Skelton is of no force and effect but is entirely void. This argument is presumably based upon the premise that the wife failed to join with the husband in the oral agreement. At the time of the presentation and acceptance of the agreement there was no written instrument purporting to transfer the easement which the wife of Ricks could

sign and acknowledge. There is evidence however which discloses that the wife as fully acquiesced in the oral agreement or joined therein as if she had herself stated or restated the same. There is evidence that Mrs. Ricks was present and heard at the beginning the conversation, negotiations and plan presented by her husband to and accepted by Skelton, and that she made no objection thereto but acquiesced therein. Thereafter Mrs. Ricks joined with her husband in the deed transferring to Skelton the 21½ foot tract upon which his portion of the building was built, which transfer was a major part of and necessary to carrying the plan or oral agreement into effect. It would appear that the agreement was as much that of Mrs. Ricks as it was that of her husband and that the rule attempted to be invoked by appellants has no application herein.

Based upon the assumption that the oral agreement was entirely void it is apparently appellants' contention that respondent Skelton and his predecessors held under a mere permissive use or revocable license. Ignoring, for the purpose of considering such theory, the oral negotiations it appears that the evidence tends to show and the logical inference to be drawn from the manner and style in which the building was planned and built that Skelton purchased the 21½ feet of land, built and paid for his proportionate share of the building and began and continued use thereof under a claim of right to an easement in the lobby, stairways and halls.

"A presumption that the use was under a claim of right, and adverse, arises from an undisputed use of an easement for the established period of prescription, and the burden is upon the party alleging that the use has been by virtue of a license or permission to prove that fact by affirmative evidence. An uninterrupted use for the requisite period unexplained is sufficient to establish a right by prescription and to authorize a presumption of a grant. After such period of enjoyment the owner of the land has the burden of proving that the use of the easement was under some license, indulgence or special contract inconsistent with a claim of right by the other party." (Thompson on Real Property, vol. 1, sec. 394, p. 509.)

The case of *Howes v. Barmon,* 11 Ida. 64, 81 Pac. 48, 114 Am. St. 255, 69 L. R. A. 568, is mainly relied upon by appellants in support of their contention. It appears that. such case is so dissimilar in point of fact that the final conclusion therein reached is not controlling in this case. In *Howes v. Barmon, supra,* there were mutual licenses or mutual conveyances; neither party expended great sums of money on the faith and promises of the other and the parties could readily be placed *in statu quo.* The opinion states:

"They have parted with no consideration for the use of this stairway nor have they lost any property or right by reason of having neglected to build a stairway themselves. If they were refused a decree in this case, they will only be left in the same position they originally occupied. *This is a case where a refusal by the court to grant plaintiffs a decree will leave them absolutely in statu quo.*"

It appears however that in the case of *Howes v. Barmon, supra,* certain rules for guidance in determining the question involved herein are well stated and may be applied to the instant case. Therein it is said:

"Where a contract or agreement, whether it be called a license or an easement, looks to the acquirement of a right of passage, as in this case, over a stairway, and rests entirely in parol, it is clear, under all authorities, that the licensee or grantee must have entered into possession, expended money, and made improvements in such manners and to such an extent that a refusal to enforce the agreement in specific terms would work a fraud upon the licensee or grantee."

and:

" . . . . courts of equity grant relief in such cases upon the principal theory that the parties cannot be placed in the position they originally occupied, and therefore equity will compel them to live up to their agreements."

Herein Skelton helped build the stairways, lobby and hallways, paying his proportionate share for the building of the same, upon Ricks' agreement for an easement over the same. Skelton expended considerable money upon the inducements of Ricks the owner of the property, not only for

the erection of his own building, but for his proportionate share of the cost of the erection of the lobby, hallways, stairways and heating plant situated in Ricks' portion of the building.

The case of *Groshean v. Dillmont Realty Co.*, 92 Mont. 227, 12 Pac. (2d) 273, 274, appears to be almost identical with the instant case. Therein Stringham and Gardner upon adjacent tracts of land constructed a two-story building, a party wall separating the building being erected on the property dividing line. At the time of building the owners inserted a door at the second story affording free passage from one building to the other and from plaintiff's second story to the street by way of a stairway on defendant's side of the wall leading from the street and terminating at the doorway. It was there argued that the use of the doorway and stairway was permissive from its inception. In the opinion the court said:

"At the outset of the trial, counsel for defendant challenged the sufficiency of the complaint upon the assumption that paragraphs 5, 6, and 7 show that the use of the doorway and stairway by Stringham was, in its inception, permissive— in effect a revocable license. We do not see our way clear to take that view. There is no evidence to sustain it. We are unable to draw any inference to that effect. Reading the three paragraphs together it is more reasonable to infer that Stringham, as a consideration for constructing the party wall, was to receive as of right free passage from his building by way of the stairway to Bannack Street. Otherwise, why should he have erected the party wall, of which Gardner was to have an equal share, on the dividing line, and why should Gardner have built a stairway alongside the party wall within his own premises terminating on the second floor at a doorway which the two cut through the wall?

"The evidence tends to sustain the inference we draw. It shows that Stringham erected the party wall at his own expense. It shows not only that the doorway gave each of the owners access to the other's building, but also that it gave Stringham the only way to his upper story from Bannack Street. . . . .

"In our view the logical inference is that Stringham began his use under a claim of right. In the absence of any evidence on the subject, the presumption under the circumstances shown here would be that Stringham held under a claim of right and not by license of Gardner, and the same is true as to the successors in interest of each. In order to overcome the presumption, thereby saving its title from the incumbrance of an easement, the burden is on the defendant to show that the use was permissive. See *Stetson v. Youngquist,* 76 Mont. 600, 248 Pac. 196, 197; *Ferguson v. Standley,* 89 Mont. 489, 300 Pac. 245; *Glantz v. Gabel,* 66 Mont. 134, 212 Pac. 858; 2 Tiffany on Real Property, (2d) ed., p. 2045; 1 Thompson on Real Property, sec. 475."

See, also, 9 R. C. L. 740; *Benedict v. Barling,* 79 Wis. 551, 48 N. W. 670; *Jensen v. Ogden State Bank,* 83 Utah, 506, 30 Pac. (2d) 1065, 1070; *Dean v. Colt,* 151 Or. 331, 49 Pac. (2d) 362, 363; *Shaw v. Proffit,* 57 Or. 192, 109 Pac. 584, 110 Pac. 1092, Ann. Cas. 1913A, 63; *Wright v. Barlow,* 169 Okl. 472, 37 Pac. (2d) 958; 9 R. C. L. 749, 750.

In *Appeal of Clelland,* 133 Pa. 189, 19 Atl. 352, 7 L. R. A. 752, the owners of adjoining lots built a single building covering both lots. The only access to the upper stories was by stairways which were altogether on one lot. It was determined by the court that the circumstances of themselves raised an equitable estoppel in favor of one party as against the other, and decreed a perpetual injunction. The opinion in part recites:

"The clear and undisputed evidence is that the building in question, covering the two lots of land originally in the joint ownership of Mr. Phelps, Mr. Pierce, and Mr. Dickson, was built by these three gentlemen upon a common and single plan, and as a single structure. It matters not, so far as we view the case, whether this plan was adopted before or after the deed of partition, or whether or not there was any express agreement with regard to the common use of the stairways. The building was erected by the owners of the land as a whole, each being liable for a proportionate part according to the extent of his ownership. There was but one plan, one set of specifications, one builder, and one contract to build;

and these were all treated as concerning one single structure, considered for the time being, as a whole. By the common design of this building, the only access provided for the second and third stories of the Pierce part was by means of the stairways upon the Phelps and Dickson parts, and through the common corridors upon the upper floors. . . . . The circumstances to which we have referred of themselves clearly raise an equitable estoppel in favor of the one party, and against the other. There is no doubt but that the present arrangement of the building was recognized at the time to be for the mutual advantage of all parties concerned; and so far as it is of such mutual advantage, this advantage cannot be denied by either party to the other. Mr. Pierce, for instance, could not cut off access through the corridors on the second and third floors from the Phelps to the Dickson part, nor *vice versa*. For the same reason the owners of the Phelps part cannot interfere with the free and common use by the owners and tenants of the Pierce part of the corridors and stairways which happen to be upon their side of the property. *The building being cast by common consent in its present permanent form, neither party can revoke the arrangement, upon the faith of which the money of the other has been expended. Each and every part is affected with what, in its nature, is a permanent servitude, so long as the building itself stands. It cannot be changed from its present form, nor the right of common access now provided for be interfered with, at the will of either party, but only by the common consent of all.*

"A right of this character, while not strictly an easement, is in the nature of one. It is really a permission or license, express or implied, to use the property of another in a particular manner, or for a particular purpose. Where this permission has led the party to whom it has been given to treat his own property in a way in which he would not otherwise have treated it, as by the erection or construction of permanent improvements thereon, it cannot be recalled to his detriment. Having expended his money upon the faith of it, and not being able to be restored to his original position, equity will not allow the permission to be revoked, in breach

of such faith. This has given rise to the doctrine of executed or irrevocable licenses.'' (Emphasis inserted.)

Appellants further urge that since neither appellants nor their predecessors in interest, other than Ricks, had notice of respondent Skelton's claim of an easement, there is no easement. As heretofore stated, the rooms above Skelton's property have continuously, since erection of the building in 1917, been leased and used by the hotel operators. Access to such rooms has at all times been gained by way of the lobby, stairways and hallways over which respondent claims an easement. The easement and use thereof was apparent from a mere examination of the premises. The very existence of the building and its construction effected notice.

''The defendants are furthermore affected with both actual and constructive notice of the right to which the plaintiff lays claim. Not only were they directly notified of its existence, but they could not use their eyes without having it plainly called to their attention. It was an evident servitude existing over the one building in favor of the other, and arising out of the permanent form in which the building had been constructed. They were thus put upon such inquiry as would have elucidated the facts upon which the plaintiff now justly relies, and are bound thereby.'' (*Appeal of Clelland, supra.*)

See, also, sec. 54–603, I. C. A.; 9 R. C. L. 803–807; *Groshean v. Dillmont Realty Co., supra; Powers v. Heffernan,* 233 Ill. 597, 84 N. E. 661, 122 Am. St. 199, 16 L. R. A., N. S., 523.

Assignment of error number 5 is predicated upon the action of the trial court in awarding respondent Eagle Rock Corporation $4,000 attorney's fees for the foreclosure of the mortgage. Among other things it is urged that the Eagle Rock Corporation is not entitled to an attorney's fee, because it does not appear in the evidence that the lender agreed to pay Mr. McCutcheon any attorney fee for his services in this case. Paragraph 16 of the complaint alleges that respondent Eagle Rock Corporation:

''has incurred the expense and liability to pay its attorney herein a reasonable fee for the collection of said note and for the foreclosure of said mortgage and the prosecution of this action, and that the sum of $5,000.00 is a fair and reason-

able fee to be allowed plaintiff's attorney for the prosecution of said suit and for the foreclosure of said mortgage'';

 The answer of Idamont Hotel Company denied each and every allegation of the foregoing paragraph. Upon the trial C. W. Poole, an attorney of this court, was called by Eagle Rock Corporation, and testified, after being fully informed of the nature of the action and of the services performed and to be performed in connection therewith, that from four to six thousand dollars would be a reasonable attorney's fee. There is no evidence in the record tending to show that the Eagle Rock Corporation has incurred the expense and liability to pay its attorney a reasonable fee or any fee. The court found, simply:

"That the sum of $4,000.00 is a fair and reasonable fee to be allowed plaintiff as and for an attorney's fee for the prosecution of said suit and for the foreclosure of said mortgage.''
and concluded:

"That said plaintiff is entitled to recover an attorney's fee of $4,000.00 for the foreclosure of the said note and mortgage,''
and awarded judgment therefor.

In *Broadbent v. Brumback*, 2 Ida. 366, 16 Pac. 555, this court announced the rule that:

"A stipulation in a mortgage for allowances for an attorney's fee in case of foreclosure is valid, but should be enforced only for a reasonable amount. In determining what amount is reasonable the court should allow no more than is actually received or contracted for by the attorney for his services.''

In *Porter v. Title Guaranty & Surety Co.*, 17 Ida. 364, 106 Pac. 299, 27 L. R. A., N. S., 111, this court speaking through the late Justice Stewart used the following language:

"To justify the court, then, in allowing attorney's fees upon the foreclosure of a mortgage, where the mortgage contains a stipulation that attorney's fees may be allowed on foreclosure of such mortgage, *the plaintiff must also prove that he has agreed to pay his counsel a stipulated or reasonable fee for his services,* and the reasonableness of the fee agreed upon or what is a reasonable fee in such an action.

Upon this evidence the court is enabled to find the amount to be allowed in such proceeding, but without such evidence there is nothing upon which the court can base a finding allowing such fee. In this case, there being no evidence that the appellant had agreed to pay its counsel a fixed or a reasonable fee in such action, and there being no evidence as to what would be a reasonable fee for the services rendered in such action the court did not err in finding that the appellant was not entitled to recover attorney's fees.'' (Emphasis inserted.)

The case of *Jardine v. Hawkes,* 44 Ida. 237, 256 Pac. 97, cited by respondent Eagle Rock Corporation, in which it was held that attorney's fees should be allowed, discloses as follows:

''The note in suit provided for a reasonable attorney's fee and the mortgage designated $200 as a fee in case of foreclosure. *The court found that the plaintiff had obligated herself to pay $200 attorney's fees. . . . .*

''There was evidence that a reasonable attorney's fee would be $125. This was not contested by defendants. They did not even ask the witness a question on cross examination. This amount may be taken to be a reasonable amount to be allowed. The court erred in not allowing attorney's fees and costs. The judgment will be modified, and the cause remanded to the lower court with instructions to modify the judgment heretofore entered and enter such modified judgment allowing $125 attorney's fees, . . . . ''

█ There being no evidence that respondent Eagle Rock Corporation had obligated itself to pay either a reasonable or any attorney fee to its attorney for the prosecution of the action, under the foregoing authorities the court was in error in concluding that an attorney fee in the amount of $4,000 should be allowed and in awarding judgment therefor.

Other assignments of error have been examined but we find no question that requires further consideration.

The judgment in favor of respondent Skelton is affirmed, with costs pertaining thereto awarded to respondent Skelton.

The judgment in favor of respondent Eagle Rock Corporation is affirmed, except as with relation to judgment for

attorney's fees, to which extent the judgment will be modified and the cause remanded to the lower court with instructions to permit respondent Eagle Rock Corporation to introduce proof in support of its allegation "that it has incurred the expense and liability to pay its attorney herein a reasonable fee for the collection of said note and for the foreclosure of said mortgage and the prosecution of this action." The judgment in favor of respondent Eagle Rock Corporation having been ordered modified, costs pertaining to the appeal therefrom are awarded to appellants.

Holden, C. J., and Ailshie and Givens, JJ., concur.

Morgan, J., dissents.