[No. 38431. Department One. November 3, 1966.]

PEOPLES NATIONAL BANK OF WASHINGTON, *as Administrator, Appellant,* v. NATIONAL BANK OF COMMERCE OF SEATTLE *et al., as Coexecutors, Respondents.*[*]

*Reported in 420 P.2d 208.

*Hawkins, Ingalls & Bonjorni* and *Duncan A. Bonjorni,* for appellant.

*Lycette, Diamond & Sylvester* and *John N. Sylvester,* for respondents.

OTT, J.—February 24, 1959, Chester M. Derbyshire and wife executed an agreement with Ray M. Perrin, a builder of homes, to sell certain real estate therein described to Mr. Perrin and his wife. Mr. Derbyshire agreed to plat the area into 7 plats, each containing approximately 33 residential lots, and to blacktop the streets, and install drains, water supply, and fire hydrants, according to King County and Federal Housing Administration specifications.

As each plat was deeded to Mr. Perrin, he would execute a note and mortgage to Mr. Derbyshire on the plat pur-

chased, the notes to be paid in 12 months or upon the third draw of construction.

September 28, 1961, the agreement of 1959 having expired, a new agreement was executed, having similar terms and conditions, and extending the term of the contract until February 15, 1964. The agreement was performed by both parties until February 10, 1962, when Chester Derbyshire became ill and was unable to continue the development work, in accordance with the original agreement. Ray Perrin then agreed to perform the development work for Mr. Derbyshire, conditioned upon his being reimbursed therefor. In this regard, two supplemental agreements were entered into, which provided as follows:

February 10, 1962

This letter signifies our acceptance of the following transactions regarding financing for the development of Plats 5 and 6, Derbyshire Addition to King County:

On each individual Plat, as listed above, Ray M. Perrin and Louise Perrin will advance funds to Chester M. Derbyshire and Ottelia Derbyshire, the amount of $27,000.00 (twenty-seven-thousand and No/100), less 10% for service charge and less 10% interest per annum. Ray M. Perrin is to pay all sub-contractors involved in the individual plat development, as the work is completed, and will make the checks out jointly to Chester M. Derbyshire, Ottelia Derbyshire and the sub-contractor. All such payments, plus the interest and service charges shall be deducted from the purchase price of the lots in Plats 5 and 6, Derbyshire Addition, which Ray M. Perrin and Louise Perrin are purchasing from Chester M. Derbyshire and Ottelia Derbyshire.

Accepted: [signed] Chester M. Derbyshire
 [signed] Ottelia Derbyshire

June 27, 1962

This letter signifies our acceptance of the following transactions regarding financing for the development of Plat 7, Derbyshire Addition to King County:

Ray M. Perrin and Louise Perrin will advance funds to Chester M. Derbyshire and Ottelia Derbyshire, his wife in the amount of $27,000.00 (Twenty-seven-thousand and No/100 Dollars). There is to be charged against this $27,000.00, a 10% service charge and interest at the rate

of 10% per annum. From this $27,000.00, Ray M. Perrin is to pay all sub-contractors involved in the individual plat development, as the work is completed. All such payments, plus the interest and service charges shall be deducted from the purchase price of the lots in Plat 7, Derbyshire Addition, which Ray M. Perrin and Louise Perrin are purchasing from Chester M. Derbyshire and Ottelia Derbyshire.

Accepted: [signed] Chester M. Derbyshire
 [signed] Ottelia Derbyshire

In conformity with the agreement on the part of the Derbyshires to sell, and the Perrins to buy, plat No. 6, the following note was executed, secured by a mortgage which by agreement, was not to be recorded until the death of the purchaser, Ray Perrin.

$43,200.00 Kent, Wash., April 25, 1962
Twelve months or see below after date, without grace, for value received we promise to pay to the order of Chester Derbyshire and Ottelia Derbyshire Forty-three-thousand-two-hundred and No/100 DOLLARS, in Lawful Money of the United State of America, of the present standard value, with interest thereon in like Lawful Money, at the rate of 0 per cent. per annum from............ ........................ until paid. Interest to be paid............ ........................ and if not so paid, the whole sum of both principal and interest to become immediately due and collectible at the option of the holder of this note. And in case suit or action is instituted to collect this note or any portion thereof we promise and agree to pay in addition to the costs and disbursements provided by statute such sum as the court may adjudge reasonable as attorney's fees in said suit. For lots 1 thru 32 of Derbyshire No. 6. Price of each lot is $1350.00, less 1% real estate tax of $13.50. Each lot to be paid for on 3rd draw of construction mortgage on each lot.

 [signed] Ray M. Perrin
 [signed] Louise Perrin

Similarly, on May 17, 1962, the Derbyshires deeded plat No. 4 to Ray Perrin and received the following promissory note, secured by a. mortgage:

$43,200.00 Kent, Wash., May 17, 1962
Twelve months or see below after date, without grace,

for value received we promise to pay to the order of Chester Derbyshire and Ottelia Derbyshire Forty-three-thousand-two-hundred and No/100 DOLLARS, in Lawful Money of the United States of America, of the present standard value, with interest thereon in like Lawful Money, at the rate of 0 per cent. per annum from .............. ............................... until paid. Interest to be paid ........................ ................................................ and if not so paid, the whole sum of both principal and interest to become immediately due and collectible at the option of the holder of this note. And in case suit or action is instituted to collect this note or any portion thereof ...................... promise and agree to pay in addition to the costs and disbursements provided by statute such sum as the court may adjudge reasonable as attorney's fees in said suit. For lots 1 thru 32 of Derbyshire No. 4, King County, Wn. Price of each lot $1350.00 less 1% real estate tax of $13.50. Each lot to be paid for on 3rd draw of construction mortgage on each lot.

[signed] Ray M. Perrin
[signed] Louise Perrin

(Although plat No. 4 was not included in the supplemental agreements, Mr. Perrin nevertheless performed the development work on this plat due to Mr. Derbyshire's illness.)

May 21, 1962, the Derbyshires deeded plat No. 7 to Ray Perrin, and received the following note, likewise secured by a mortgage:

$45,900.00 Kent, Wash., May 21, 1962
Twelve months or see below after date, without grace, for value received we promise to pay to the order of Chester Derbyshire and Ottelia Derbyshire FORTY-FIVE-THOUSAND-NINE-HUNDRED and No/100 DOLLARS, in Lawful Money of the United States of America, of the present standard value, with interest thereon in like Lawful Money, at the rate of 0 per cent. per annum from .............. ................................ until paid. Interest to be paid............... ................................ and if not so paid, the whole sum of both principal and interest to become immediately due and collectible at the option of the holder of this note. And in case suit or action is instituted to collect this note or any portion thereof ...................... promise and agree to pay in addition to the costs and disbursements provided

by statute such sum as the court may adjudge reasonable as attorney's fees in said suit. For lots 1 thru 34 of Derbyshire No. 7, King County, Wn. Price of each lot $1350.00 less 1% real estate tax of $13.50. Each lot to be paid for on 3rd draw of construction mortgage on each lot.

[signed] Ray M. Perrin
[signed] Louise Perrin

The fourth note involved, in the sum of $100, was given as earnest money for the original agreement entered into between the parties on February 24, 1959.

August 31, 1962, Chester Derbyshire died, and his estate was probated in King County. The Peoples National Bank of Washington was appointed administrator with the will annexed. Prior to his death, the building and development work on plat No. 5 had been fully accomplished and payment made therefor. At the time of his death, certain of the development work on plats Nos. 4, 6, and 7 had been accomplished by the Perrins, in accordance with the supplemental agreements. The balance of the development work was completed by them after his death. The Perrins did not file a creditors' claim in the Derbyshire estate for the sums due them for the development work performed either before or subsequent to the death of Chester Derbyshire.

After the time for the filing of claims had expired, the Peoples National Bank, as administrator with the will annexed, commenced this action to recover the sums due on the promissory notes. The Perrins' answer admitted the execution of the notes, and affirmatively pleaded that they were not indebted to the estate in any amount for the reason that the cash payments they had made to the Derbyshire estate, together with credit due them for the development work, more than offset the total of the notes.

February 16, 1965, Ray M. Perrin died, and the National Bank of Commerce of Seattle and Louise Perrin, as coexecutors, were substituted as party defendants.

The cause was tried to the court, commencing May 13,

1965. The court entered judgment in accordance with the prayer of the defendants, and dismissed the action.

Plaintiff appeals.

For clarity, Chester M. Derbyshire and Ray M. Perrin, although now both deceased, will be herein referred to as parties appellant and respondent respectively.

Appellant asserts that there was a merger of all agreements, conversations, and contemporary negotiations in the execution and delivery of the warranty deeds to the real estate here in question, and that the court erred in permitting the respondent to introduce evidence relative to the transactions which preceded the execution of the deeds.

The terms of the contract of September 28, 1961, required that a warranty deed be given, and that Mr. Derbyshire perform services subsequent to the execution of the deed. In this regard, the contract between the parties provided, *inter alia*:

> Each tax title lot to be subdivided and plotted into individual lots. The lots not to be more than thirty-four for each ten acres and further, said lots will comply with zoning regulations. The price of each individual lot shall be determined by the parties hereto; however, the selling cost of each individual lot shall not exceed $1,350.00. *Sellers to deed individual lots to purchaser as needed.* Payment for the purchase of said lots shall be as follows: Purchaser shall give the Sellers a note for $1,350.00 on each individual lot with said note to be secured by a second mortgage. Said second mortgage not to be recorded except in the event of purchaser's death. Individual notes payable on the 3rd draw of the purchaser's construction loan on each individual lot, with $500.00 of the price of each lot being retained by the purchaser until Sellers have completed blacktopping of the roads, installation of drains, adequate water supply and fire hydrants in accordance with King County and FHA specifications.

> The Seller agrees to plat the property and to comply with all platting requirements. The purchaser agrees to purchase a minimum of ten (10) individual lots and to build houses on a minimum of ten (10) individual lots each year from date hereafter. In the event purchaser does not purchase the minimum of ten (10) lots per year

the Sellers have the right and shall be free to sell lots to purchasers other than the purchaser herein; otherwise, as long as purchaser continues to purchase a minimum of ten (10) building lots per year of the above-described property, purchaser shall have the exclusive right to purchase said property from the Sellers herein on the conditions as set forth herein until the full amount of property described herein shall be sold to the purchaser by the Sellers herein.

This option to remain in full force and effect until February 15, 1964 and can be renewed by mutual consent of both parties.

The Sellers shall furnish Title Insurance on all lots. The purchaser shall pay the 1% real estate tax on each lot and deduct this amount from payment to the Sellers at the time the 3rd construction draw is made.

Sellers further grant to purchaser and agrees [sic] that the purchaser shall have the right to hook into any water distribution system maintained by the Sellers to serve purchaser's properties from adjacent or nearby lands other than those described herein, and it is agreed that the cost to the purchaser of such construction and connections shall be the actual costs of such hook-ups and installations.

*The terms and conditions of this Agreement shall be binding upon the assigns, heirs and personal representatives of the parties hereto.* (Italics ours.)

■ As a general rule, the provisions of a contract for the sale of real estate, and all prior negotiations and agreements, are considered merged in the execution and delivery of the deed. *Jones v. National Bank of Commerce of Seattle,* 66 Wn.2d 341, 402 P.2d 673 (1965), and case cited.

There are exceptions to the merger rule, when the terms of the contract of sale of real estate provide that the contract is not fully performed by the delivery of the deed. Under such circumstances, there is no presumption that either party, in giving or accepting the deed, waives the performance of the remaining terms of the contract. *Dunseath v. Hallauer,* 41 Wn.2d 895, 253 P.2d 408 (1953).

The contract here in question falls within the exception to the merger rule. The grantor and grantee were required, by the express terms of the contract, to perform substantial

duties subsequent to the execution and delivery of the deed. The execution and delivery of the deed, therefore, did not constitute a waiver by either party of the performance of the remaining covenants.

We find no merit in this assignment of error.

■ Appellant next asserts that the court erred in admitting evidence in violation of the deadman statute. RCW 5.60.030 provides in part:

> [I]n an action or proceeding where the adverse party sues or defends as executor, administrator or legal representative of any deceased person, or as deriving right or title by, through or from any deceased person, . . . then a party in interest or to the record, shall not be admitted to testify in his own behalf as to any transaction had by him with, or any statement made to him, or in his presence, by any such deceased . . . .

The evidence which appellant contends was improperly admitted consisted of cancelled checks, receipts, and records introduced to establish payments made by the respondent to third persons, in accordance with the terms and conditions of the supplemental agreements made on February 10, 1962, and June 27, 1962, set forth above. Proof of transactions with third persons is not barred by RCW 5.60.030, *supra*. *In re Krause's Estate,* 173 Wash. 1, 21 P.2d 268 (1933); *Floe v. Anderson,* 124 Wash. 438, 214 Pac. 827 (1923).

This assignment of error is without merit.

Appellant next assigns error to the court's failure to find that the agreements dated February 10, 1962, and June 27, 1962, were usurious contracts.

The supplemental contracts quoted above provided that the Perrins would receive 10 per cent interest per annum upon the sums advanced on behalf of the Derbyshires for the development work, and an additional 10 per cent for "service charge."

■ The "service" for which Mr. Derbyshire agreed to pay Mr. Perrin a 10 per cent fee entailed the supervision of extensive development work, including platting the area, blacktopping the streets, installing drains, water supply, and fire hydrants, and contracting with others for work, services,

and materials which the parties by the agreements dated February 10, 1962, and June 27, 1962, estimated to be in the sum of $81,000. The payment for such services at 10 per cent of the cost is clearly not payment for the use of money, but for actual services performed. The contracts were therefore not usurious.

Appellant next asserts that the respondent did not file a creditor's claim in the estate of Chester Derbyshire, pursuant to RCW 11.40.010, for the services performed; hence, the claim is now barred by the statute.

■ In *McDonald v. McDonald,* 119 Wash. 396, 402, 206 Pac. 23 (1922), we stated an exception to this statutory requirement as follows:

> [A]n unpresented claim may be used as an offset against a demand the estate seeks to enforce against the claimant if it existed at the time of the death of the executor's decedent, although it is limited to the extinguishment of the debt.

By the agreement of September 28, 1961, the parties contracted that "The terms and conditions of this Agreement shall be binding upon the assigns, heirs and *personal representatives of the parties hereto."* (Italics ours.) The agreement provided that Mr. Derbyshire would do the development work. On February 10, 1962, and June 27, 1962, the contract of September 28, 1961, was modified in one particular only, namely, that the Perrins would perform the development work on behalf of the Derbyshires, and be reimbursed by being allowed deductions "from the purchase price of the lots . . . which Ray M. Perrin and Louise Perrin are purchasing from Chester M. Derbyshire and Ottelia Derbyshire." The obligation of the Perrins to perform the development work on behalf of the Derbyshires existed prior to the death of Mr. Derbyshire.

We hold that, when the Derbyshire estate sought to collect the alleged sum due on the promissory notes, the Perrins' expenditures on behalf of the Derbyshire estate and service charges were allowable as an offset against the claimed indebtedness.

These facts bring this case within the exception to the

claim statute, as announced in *McDonald v. McDonald, supra.* We find no merit in this assignment of error.

Appellant next contends that the court improperly construed the promissory notes and disregarded the provisions of the contract, when the court allowed an offset of $13,500 to the Perrins for 10 lots, upon which the Perrins did not build houses and to which lots the Perrins retain title. With this assignment of error, we agree.

Neither the contract nor the notes provide that the purchaser may (1) retain title to any lot upon which he elects not to build a residence, or (2) return a lot for any reason after he has purchased it.

During the course of the trial, the respondent steadfastly maintained that he did not have to pay for any lots which he found to be unbuildable. His statement in this regard is as follows:

> [W]e admit the deeds. We own the title to the property for whatever it is worth. . . . THE COURT: Is it your theory that, although you take title to the deed and do not deny that you have title, that you do not have to pay for it because it is not buildable? MR. SYLVESTER: That is right. THE COURT: Is there something in one of the agreements that indicates that? MR. SYLVESTER: No, except here the man comes in and with his own handwriting and says that mention of steep portion of western end of southern area —

The evidence established that the 10 lots, even though steep, were buildable lots. They were not, however, as desirable for building purposes as the lots upon which the respondent built. As early as September 1961, Chester Derbyshire noted in his own handwriting that some of the lots were steep. At the time the plats in question were deeded, the parties were fully aware that some of the lots were less desirable for building than others. Nevertheless, with this knowledge on the part of both the seller and the purchaser, Mr. Derbyshire deeded the less desirable lots to Mr. Perrin, and Mr. Perrin accepted the lots by giving his note and mortgage therefor at the agreed purchase price.

The trial court ruled that the respondent did not have

to pay for these lots for the reason that the notes each provided for an alternative maturity date as follows: "Twelve months or see below after date . . . Each lot to be paid for on 3rd draw of construction mortgage on each lot." The trial court concluded that, if the lots were not built upon, there would never be a third draw from the finance company; hence, it held that such lots upon which there had been no "3rd draw" were not to be paid for.

To construe the notes that they would not mature in 12 months from date, but, rather, were to mature only in the event the purchaser elected to build thereon, would mean that, if the purchaser failed to build on any of the lots, he would never have to pay for any of them, but would retain title thereto. Such a construction would be untenable and unreasonable. Contracts must be reasonably construed to accomplish the intent of the parties. *Felton v. Menan Starch Co.*, 66 Wn.2d 792, 405 P.2d 585 (1965), and cases cited. We find nothing in the execution and delivery of the deeds and the notes which indicates that Mr. Perrin was not obligated to pay for the lots. The words "Twelve months or see below after date" and "on 3rd draw of construction," must be given a reasonable construction, if the intent of the parties is to be preserved. A reasonable and tenable construction requires that, if the third draw of construction occurred prior to the expiration of 12 months, the notes would mature upon that date. If there were no third construction draw, then the notes would mature 12 months from the date of the making thereof.

We hold that the court erred in granting to the respondent an offset of $13,500 for the lots upon which the respondent did not build, but for which he agreed to pay and continued to retain and manifest ownership thereof.

The trial court found the amount of all other offsets to be in the sum of $120,320.15. The total amount of the principal of the notes is $132,400. Deducting the allowable offsets leaves a balance due to appellant on the notes in the sum of $12,079.85.

Should attorneys' fees be allowed upon the balance due on the notes? Two of the notes provide: "we promise

and agree to pay . . . such sum as the court may adjudge reasonable as attorney's fees in said suit." Two of the notes do not include the word "we" in the blank provided therefor, but retain the clause in the printed form providing for attorneys' fees.

We hold that, since there was no deletion in either of the notes of the clause relating to attorneys' fees, it was the intention of the parties that attorneys' fees be allowed in the event suit or action was instituted. Upon remand, the court will determine the amount to be awarded herein as reasonable attorneys' fees, based upon the amount of the recovery.

The notes do not provide for interest. Interest is allowed at the rate of 6 per cent per annum from May 21, 1963, the date the last note matured and remained due and unpaid.

The judgment is reversed, and the cause remanded with instructions to enter judgment for appellant in accordance with the views herein expressed.

HILL, HUNTER, and HALE, JJ., and POYHONEN, J. Pro Tem., concur.