462 P.2d 503

**Leonard L. BETHKE and Deon Bethke,
Plaintiffs-Appellants,**

v.

**IDAHO SAVINGS & LOAN ASSOCIATION,
a corporation, Defendant-Respondent.**

No. 10345.

Supreme Court of Idaho.

Dec. 11, 1969.

Whittier & McDougall, and John R. Black, Pocatello, for appellants.

J. Dennis Faucher, Boise, Terrell, Green, Service & Gasser, Pocatello, for respondent.

McQUADE, Justice.

·Leonard Bethke and Deon Bethke, plaintiffs-appellants, commenced this action on December 27, 1965, charging that the respondent Idaho Savings and Loan Association charged interest in excess of the then legal rate of 8% per annum[1] on a note which appellants executed in favor of respondent on February 12, 1962. The note was for a face amount of $12,000, payable over a period of 240 months by monthly installments of $92.31, the first payment to be made on or before June 15, 1962. It carried a stated interest rate of 6.9%, and the total interest charged over the twenty year term of the note was to be $10,154.40 (which, curiously enough, was $3.44 less than the amount called for by the respondent's amortization statement). In addition to this nominal interest, respondent charged the appellants $51.73 additional interest on a "construction loan account," and the respondent withheld $1,200 from the $12,000 of the loan as a "service" fee. This 10% service charge was withheld prior to the performance of any services (although a number of services of a supervisory sort were, in fact, later rendered), and it was the respondent's policy to deduct such amount automatically without regard to whether services actually would be performed or not.

The trial court found, as a factual matter, that the $1,200 service fee was not

---

1. I.C. § 27–1905 (1948). This section has since been amended and recodified; it may now be found in 5A I.C. § 28–22–105, and the maximum rate of interest is now 10%. The law at the time the contract was made governs, Union Central Life Ins. Co. v. Rahn, 63 Idaho 243, 246, 118 P.2d 717 (1941).

actually a legitimate service fee, but was prepaid interest, because "the same was deducted prior to and regardless of whether any services were, in fact, performed." [2] The lower court also concluded, however, that, under the law of Idaho as announced in Eagle Rock Corp. v. Idamont Hotel Company [3] the total interest charged over the entire term of the loan was not usurious. The appellants attack this determination urging that the *Eagle Rock Corp.* case is distinguishable from this one, or that the formula used therein to determine the "margin" over the nominal interest on the loan within which "hidden" interest charges might be incurred without running afoul of the usury laws is incorrect.

*On its pertinent facts, Eagle Rock Corp. v. Idamont Hotel Company is practically indistinguishable from this case.* It involved a note and mortgage which provided for 120 equal payments of $653.42 per month over a ten year period. The face amount of the loan was $53,000 and the nominal interest was 8%, 2% less than 10% which was then the maximum rate of interest chargeable. The borrowers in that case actually received $51,145, however, the lenders withheld $1,855 as "commissions and membership fees." It was alleged that this $1,855 was an advanced interest payment and that it brought the total interest over the 10% maximum and that the loan was therefore usurious. This Court held, however, that it was not usury. The following reasoning was used to reach that conclusion:

"The rule which this court has announced and followed with respect to the manner of determining whether usurious interest has been charged or collected is stated in Easton v. Butterfield Live Stock Co., 48 Idaho 153, 279 P. 716, as follows:

'In determining whether usurious interest has been charged or collected under a particular contract *it is not permissible to consider only a portion of the term.* The test is, *D*id the lender under his contract charge or receive a profit on his investment in excess of the maximum rate for the full period of the loan? If he has, there is usury; otherwise, not.' (See annotation of cases 82 A.L.R., page 1214.)

"* * * There appears to be no question that the interest on $53,000 payable as the note and mortgage herein provided and figured at the rate of 8 per cent per annum was correctly computed and amounted to $24,210.40 for the full term of 120 months. Under the law existing at the time the contract was made the parties might lawfully have contracted for the payment of interest not to exceed the sum of 10 per cent per annum. * * * Simple computation discloses that interest at 10 per cent rather than at 8 per cent would increase the total amount of interest for the same term by the amount of one-fourth of $24,210.40, *or by $6,052.60, which latter amount may* be used as a yardstick or margin to determine whether the interest was usurious or exceeded the sum of 10 per cent per annum." [4]

This, then, is the "Eagle Rock formula"; the difference between the maximum allowable interest rate and the nominal interest rate, as a numerator, over the nominal interest rate, as the denominator, times the amount of money properly chargeable

2. Respondent has taken no appeal from this finding and we need not and will not reach it in this opinion. It may, however, be noted that merely because a service fee is charged in advance, when the number and kind of services to be performed are only potential and contingent, it does not necessarily follow that the fee is a cover for usury. Many of the services involved in a mortgage transaction could probably be predicted with fair accuracy and could reasonably be charged in advance, when it is certain that the debtor has enough money and without the trouble and expense of a later periodic billing. An apt analogy is the lawyer's practice of charging a retainer before he begins to work on a case.

3. 59 Idaho 413, 85 P.2d 242 (1938).

4. Eagle Rock Corp. v. Idamont Hotel Co., *supra* n. 3, at 424, 85 P.2d at 245, 246.

as interest over the entire term of the note, the product equaling the amount of money which could be charged as extra, "hidden" interest without breach of the usury law. In the present case the equation would be as follows:

$$\left[\frac{(8\% - 6.9\%)}{6.9\%} = \frac{1.1\%}{6.9\%}\right] \cdot \$10,154.40 = \$1,618.82$$

This resulting margin of additional allowable interest is substantially more than the deducted sum of $1,200 plus $51.73 which was charged over the amount of the stated interest in this case. The holding in the Eagle Rock Corp. case and the figures used by this Court in that case should, therefore, control the result in this case and the lower court's judgment should be upheld. The appellants argue compellingly, however, that the "Eagle Rock formula" is an inadequate basis for decision and offer their own formula in its stead. We disagree with that contention.

The appellants urge us to adopt a formula which is, they argue, a more accurate device for computing effective interest rates. It is, they say, the formula which is generally used in accepted accounting practice. While it is true the laws should strive for precision, the appellants' argument ignores two important considerations are the legislative purpose behind the laws of which we must be acutely aware in the performance of our function as the final interpreters of the law of this state, they which we construe and the beneficial policies underlying the doctrine of *stare decisis*.

Although at this date it hardly seems necessary to further elaborate on the doctrine of *stare decisis*, we will discuss it briefly in order that the principles which underlay our decision today may be clear. The late Professor Henry M. Hart set out a concise catalogue of the considerations which are thought to support a general practice of adherence to prior holdings:

"1 *In furtherance of private ordering—*

"(a) The desirability of enabling people to plan their affairs at the stage of primary private activity with the maximum attainable confidence that if they comply with the law as it has theretofore been announced, or can fairly be expected to be announced thereafter, they will not become entangled in litigation.

"(b) The desirability of providing private counsel so far as possible with stable bases of reasoning. * * *

"(c) The desirability of encouraging the remedial processes of private settlement by minimizing the incentives of the parties to try to secure from a different judge a different decision than has been given by the same or other judges in the past.

"2. *In furtherance of fair and efficient adjudication—*

"(a) The desirability, from the point of view of the litigants, of expediting litigation and minimizing its costs by sparing them the necessity of relitigating every relevant proposition in every case.

"(b) The need, from the point of view of the judicial system, of facilitating the dispatch of business—indeed, the sheer impossibility of reexamining *de novo* every relevant proposition in every case.

"(c) The need of discouraging a rush of litigation whenever there is a change of personnel on the bench.

"(d) The desirability, from the point of view of fairness to the litigants, of securing a reasonable uniformity of decision throughout the judicial system, both at any given time and from one time to another.

"(e) The desirability of promoting genuine impersonality of decision by minimizing the elements of personal dis-

cretion, and of facilitating the operation of the check of professional criticism.

"(f) The propriety of according respect to the conclusions of predecessor judges.

"(g) The injustice of disappointing expectations fairly generated at the stage of primary private activity.

"3. *In furtherance of public confidence in the judiciary*—

"(a) The desirability of maximizing the acceptability of decisions, and the importance to this end of popular and professional confidence in (1) the impersonality of decisions and (2) their reasoned foundation, as manifested both by the respect accorded to them by successor judges and by their staying power.

"(b) The necessity, considering the amorphous nature of the limits upon judicial power and the usual absence of an effective political check at the ballot box, that judges be subject to the discipline and the restraint of an obligation to build upon the prior law in a fashion which can withstand the test of professional criticism." [5]

In the course of our decisions we have consistently attempted to serve these important purposes.[6] And, recognizing the necessity of a stable environment for private planning, we have been particularly concerned not to unsettle the law relating to matters of property and commercial transactions. Thus we said in the case of Scott v. Gossett:

"The former decision of this court, having been acted upon by the people, who have adjusted the business matters of the county, funded old indebtedness, and created new, should not be disturbed at this late day. No good would be accomplished by overruling that decision, but much evil and confusion would result therefrom. Whether that decision was right or not, public policy and sound legal principles demand that we now adhere to it, and regard that question as a sealed book, which is no longer open to public scrutiny." [7]

This is not of course a rule of unreasoning acquiescence. We will not follow incorrect decisions merely because they are there, "the rule, *to stand by decided cases,* and *to maintain former adjudications,* contemplates more than blindly following some former adjudication, manifestly wrong." [8] We should, nonetheless, be most careful before we consider overruling a holding such as the one announced in the *Eagle Rock* case which has lasted for over thirty years and upon which unnumbered contractual and property relationships may be founded. As was early said by this Court, in the leading case of Walling v. Bown,

"[i]t seems to be generally conceded that where the beneficial results to be obtained by a departure from the construction and interpretation placed by a court of last resort upon a constitutional or statutory provision will not greatly exceed the disastrous and evil effects likely to flow therefrom, courts should refuse to reopen such questions." [9]

Before we risk, therefore, unsettling the countless relationships which may have been entered into in reliance on the *Eagle Rock* holding, we should examine that rule

5. H. M. Hart, Jr. and A. M. Sacks, The Legal Process: Basic Problems in the Making and Application of Law, 587–588 (Cambridge tentative ed. 1958).

6. *E. g.* Scott v. Gossett, 66 Idaho 329, 158 P.2d 804 (1945); State v. Cranston, 59 Idaho 561, 85 P.2d 682 (1938); In Re Speer, 53 Idaho 293, 23 P.2d 239, 88 A.L.R. 1086 (1933).

7. Scott v. Gossett, *supra* n. 6, 66 Idaho at 334, 158 P.2d at 806; accord, International Mortgage Bank v. Barghoorn, 43 Idaho 24, 24 P. 868 (1926); Robinson v. Colonial Discount Co., 106 Ga.App. 274, 126 S.E.2d 824 (1962); Monday v. Millsaps, 197 Tenn. 295, 271 S.W.2d 857 (1954).

8. Higer v. Hansen, 67 Idaho 45, 64, 170 P.2d 411, 423 (1946); *see also* Kerr v. Finch, 25 Idaho 32, 135 P. 1165 (1913).

9. 9 Idaho 740, 743–744, 76 P. 318, 319 (1904); accord, Abbott v. Continental National Bank of Lincoln, 169 Neb. 147, 98 N.W.2d 804, 807 (1959).

in terms of its service to the policies of the usury laws. We should only overrule the formula in the *Eagle Rock* case if it is clearly at odds with the purposes of the statute.

▮▮▮▮ The usury laws have aptly been called blunt instruments of social control.[10] They have but a single purpose. That is to protect "the necessitous debtor against extortion which he is practically helpless to resist."[11] We have repeatedly, and recently, held that the usury laws were not designed to permit a debtor to default on a contract which was not clearly oppressive, which was not clearly within the prohibition of the usury law, and into which he had entered knowingly, freely and with arms length bargaining.[12] The twin goal of protecting the helpless debtor while avoiding unnecessary disruption of commercial transactions may be succinctly summed up in the aphorism that usury laws are meant to be shields and not swords.[13] In service of this two-legged principle a number of rules have evolved designed to protect the right to fairly and freely contract from the harsh penalties of the usury laws. It is said, for instance, that the usury statute will not be construed to include matters not explicitly within them.[14]

The burden is on the party alleging usury to show it by clear and convincing proof, especially if the unlawful overcharge is not obvious on the face of the transaction.[15] And, a lender, in order to be held liable to the forfeitures prescribed in the usury statute, must be found to have knowingly and with corrupt intent charged usurious interest.[16] And it has been held that excessive interest charged for only part of a term is irrelevant if the interest charged for the entire period of the loan was within the law.[17]

The scheme which these rules mark out is one in which the purpose of the "quasi-penal" usury statute to reach the knowing lawbreaker, the intentional extortionist, is easily served without dilution in close cases of the law's traditional protection of the right to contract. The *Eagle Rock* rule is in no sense inconsistent with this scheme. Indeed, it is in substantial accord with the law's intent. The formula adopted by this Court over 30 years ago, because it provides an easily computable "bright line" for determining what "hidden" interest charges are large enough to be usurious, gives clear warning to the lending professions of what will run afoul of the law, while not

10. Shanks, Practical Problems in the Application of Archaic Usury Statutes, 53 Va.L.Rev. 327, 329 (1967).

11. Freedman v. Hendershott, 77 Idaho 213, 219, 290 P.2d 738, 741 (1955); accord, Meridian Bowling Lanes, Inc. v. Brown, 90 Idaho 403, 415, 412 P.2d 586, 592–593 (1966).

12. *See* Meridian Bowling Lanes, Inc. v. Brown, *supra* n. 11, at 412–415; *see generally* Petersen v. Philco Finance Corp., 91 Idaho 644, 428 P.2d 961 (1967); Bell v. Idaho Finance Co., 73 Idaho 560, 255 P.2d 715 (1953); Easton v. Butterfield Live Stock Co., 48 Idaho 153, 279 P. 716 (1929).

13. Meridian Bowling Lanes, Inc. v. Brown, *supra* n. 11.

14. Petersen v. Philco Finance Corp., *supra* n. 12; Milo Theater Corp. v. National Theater Supply, 71 Idaho 435, 233 P.2d

425 (1951); Finney v. Moore, 9 Idaho 284, 74 P. 866 (1903).

15. Meridian Bowling Lanes, Inc. v. Brown, *supra* n. 11; Olson v. Caufield, 32 Idaho 308, 313, 182 P. 527 (1919)

16. Patrick v. Bisbee, 52 Idaho 369, 373, 15 P.2d 730, 731 (1932); Musser v. Murphy, 49 Idaho 141, 145–146, 286 P. 618, 619 (1930); Easton v. Butterfield Live Stock Company, *supra*, 48 Idaho at 162–163, 279 P. 716; Anderson v. Creamery Package Manufacturing Co., 8 Idaho 200, 67 P. 493, 56 L.R.A. 554 (1902). But cf. Freedman v. Hendershott, *supra*, 77 Idaho at 218, 290 P.2d 738.

17. Easton v. Butterfield Live Stock Company, *supra*, 48 Idaho at 159–160, 279 P. 716; cited with approval Eagle Rock Corporation v. Idamont Hotel Co., *supra*, 59 Idaho at pp. 424, 426, 85 P.2d at pp. 245–247.

penalizing the accidental, marginal contract.[18] We, therefore, refuse to overrule the formula announced in the *Eagle Rock* case, including the use of the face amount of the loan, apparently freely and openly bargained for in this case, as the base amount upon which the interest may be calculated. If our formula is so at odds with the statutory scheme, the legislature may, of course, at any time change it. It should be noted that throughout the frequent revisions of the usury statutes made since Eagle Rock Corp. v. Idamont Hotel Company was decided in 1938, there has been no attempt by the legislature to substitute an alternative formula for the one announced in that case.

 Holding, as we do, that there is no good reason to depart from the normal principle of *stare decisis* and that, therefore, the formula in the *Eagle Rock* case is the correct one, we must affirm the computations and judgment of the court below based on that formula.

Affirmed. Costs for respondent.

MARTIN and SCOGGIN, D. JJ., concur.

DONALDSON, Justice (concurring in the result).

For the reasons set out in the dissenting opinion, I believe that the face amount of a note should not be used in computing interest if, as a matter of fact, it is more than the amount actually loaned. "Interest" is not a special or technical term which may have one meaning to a layman, another to an accountant, yet another to a lawyer or a judge and still another to a legislator. It means the same to us all. Interest is the price which a debtor pays for the use of a fixed amount of money, that is the "principal." In our decimal system, interest is generally stated as a percent, being a sum which is in the same ratio to the principal amount as another number is to 100. Thus, any school boy knows that six percent interest on $200 for one year is $12, because 12 is to 200 as 6 is to 100. It is as simple as that.

When interest is computed on a declining balance the computation becomes more difficult, but the meaning of the word "interest" does not change, it is still the price of money lent stated as a ratio to 100. Because the meaning of "interest" is so mathematically certain, mathematicians and accountants have long since established tables and formulas which are universally recognized as correctly stating the actual amount of interest chargeable at any rate, over any period, for any amount of principal and for any number of installments on a declining balance amortization. The amounts and the rates of interest which may be derived by simple calculations from these amortization tables by the use of these formulas comport exactly with what we all, accountant or not, understand to be interest. This court, nearly ten years before it blundered into the Eagle Rock Corp. v. Idamont Hotel Company, 59 Idaho 413, 85 P.2d 242 (1938), formula relied upon by the majority, declared that these tables were the correct soures for figures which should be used in usury cases. United States Building & Loan Ass'n v. Lanzarotti, 47 Idaho 287, 274 P. 630 (1929). I believe that we should adhere to that rule, and that we should use the formulas and tables which are standard in accounting practice in the determination of usury cases in Idaho. And, because interest is the price for the use of money actually loaned, I agree with the dissent that the amount of principal on which interest is to be figured

---

18. It should be noted that the purposes for which appellant's formula was designed are those of the accounting profession. These bear no logical relationship to the purposes of the usury laws which our formula is meant to serve. Indeed, the difficulty encountered by the trial court in his attempt to find two accountants to agree on what the effective interest rate actually was militates strongly in favor of our clear, easily to compute formula. Memorandum opinion of District Judge Arthur P. Oliver, transcript at 116.

should be the amount actually loaned and not simply the face amount of the loan, when the two figures are not the same. In this case the court should have used recognized standard tables to determine the amount of interest chargeable on $10,800 at the maximum rate of interest 8%, over the term of the note, 20 years.

I cannot however agree with the dissent that the *Eagle Rock* case is distinguishable. The language used in the opinion in that case, on page 424 of 59 Idaho, on pages 245–246 of 85 P.2d, indicates that the court considered the trial court's finding that the extra charges were not actually interest *irrelevant as a matter of law*. The court said quite clearly that even if it were interest, it was not usurious because it did not bring the total amount of interest charged to a sum in excess of the interest which could be lawfully charged *on the face amount of the loan*. As I read the case this seems to represent the holding in *Eagle Rock* on the usury question. I would, therefore, overrule that case on this question. I would prefer that this court follow the authority cited by the dissent and use the actual and not merely the face amount of a loan to compute interest and I would follow the *United States Building & Loan Ass'n* case, *supra*, and use the tables and formulas of the accounting profession to make that computation.

The arguments which the majority make in favor of respecting the *Eagle Rock* case, which is over 30 years old, and the probable reliance of the banking fraternity on it are, however, most persuasive. But, as the majority points out we should "not follow incorrect decisions merely because they are there." It is not impossible, however, to delete the *Eagle Rock* formula from our jurisprudence, while protecting the relationships which have been entered into in reliance on that mistaken decision. I would follow the well reasoned opinion of the Court of Appeals of Kentucky in Mutual Life Ins. Co. of New York v. Bryant, 296 Ky. 815, 177 S.W.2d 588, 153 A.L.R. 422 (1943), and overrule

the formula announced in the *Eagle Rock* case prospectively only, as of today. If this were done this loan and all other loans presumably entered into in reliance on the *Eagle Rock* case would be left undisturbed, but we would place our law on the rational course from which it strayed over thirty years ago for all transactions arising hereafter.

For the reasons set out above I concur in the majority's result.

McFADDEN, Chief Justice (dissenting).

The majority opinion equates the facts in the instant case with those in Eagle Rock Corp. v. Idamont Hotel Co., 59 Idaho 413, 85 P.2d 242 (1938), and concludes that the facts are practically indistinguishable from this case. I disagree with this conclusion.

In the instant case the trial court specifically found

"IV

"At the time the note was executed, defendant, by means of check No. 12699 made payable to plaintiff, Leonard L. Bethke, and endorsed by Leonard L. Bethke, received from the proceeds of the loan the sum of $1,200.00. This amount was designated by defendant as a service fee and was deducted from the principal amount prior to any service being performed by defendant.

"V

"The Court finds that the separate service fee would have been received by defendant association whether services had been performed or not and that this fee was a part of company policy at the time the loan was made to plaintiffs.

"VI

"Defendant, by and through its agents, did in fact make numerous inspections of the property in American Falls during

the process of construction and did obtain seventeen lien waivers from materialmen, laborers and contractors and made disbursements of loan funds to laborers, materialmen and contractors for the benefit of plantiffs. That these inspections, obtaining lien waivers and disbursements of funds were made by the Pocatello office of defendant corporation.

## "VII

"The $1,200.00 service fee was not justified as a service fee and, therefore, was additional interest."

However, in Eagle Rock Corp. v. Idamont Hotel Co., supra, the court stated at 59 Idaho 422, 85 P.2d 245:

"It is thus urged by appellants that the sum of $1855, deductions and exactions, constitute a disguise attempted to be used to shield the transaction from usury. Of this amount $795 was charged to commissions. The court found:

" 'That in disbursing the funds representing the proceeds of the loan made by the mortgagee to the mortgagor, $397.50 was paid to the Eastern Idaho Loan & Trust Company as a commission, and $397.50 was paid to D. W. Stowell as a commission, and said payments were made at the request of the Hotel Company, and no portion of said sums were received by the mortgagee or any employee thereof.'

"The record does not disclose that any objection was ever made to the deduction or payment of these commissions until the time of the suit to foreclose. * * * There is nothing in the record to indicate anything other than that the commission was properly charged against appellants and credited and paid to the Eastern Idaho Loan & Trust Company and D. W. Stowell. There is evidence that the item of $1,060 was a charge made to cover a 2 per cent membership of the stock of the Mountain States Building & Loan Association, and that such was shown in the statement rendered to the Idamont Hotel Company at the time. Appellants do not urge, nor is there any evidence tending to show, that they did not receive stock in the Mountain States Building & Loan Association to the amount of the membership fee paid. On the other hand the mortgage discloses that 530 shares of stock of the Mountain States Building & Loan Association was pledged as collateral security for the mortgage. *It does not appear from the record that the $1,855 were improper deductions for the purposes named nor that the amounts must be considered as additional payments of interest over and above the amount contracted for by the mortgage.*" 59 Idaho at 422–424, 85 P.2d at 245. (Emphasis added.)

It is my conclusion that there is significant distinction between the instant case and the Eagle Rock Corp. v. Idamont Hotel Co. case in that here the trial court found $1,200 of the principal amount to be interest, whereas in the Eagle Rock Corp. case the Supreme Court determined "that the $1855 were not improper deductions * * *." In the Eagle Rock Corp. case the $1855 was not deducted from the base amount of $53,000.00 to determine the amount of interest that could properly be computed. Here, however, the $1,200.00 should first be deducted from the $12,000.00 face amount of the note, in order to determine the principal sum for the computation of interest, which the appellants assert to be usurious.

It is my conclusion that the method of computation employed in the Eagle Rock Corp. case is incorrect if it is to be construed as the basis to compute the allowable interest on the face amount of the loan without recognizing that withheld "service fees" may or may not properly be chargeable to the borrower. It is well settled that bonuses, commissions, or service fees paid to a lender are not to be considered as additional interest if the services performed by the lender are for the borrower's benefit and are reasonable

and are justified. Altherr v. Wilshire Mortgage Corp., 104 Ariz. 59, 448 P.2d 859 (1968); Peoples Nat'l Bank of Wash. v. National Bank of Commerce of Seattle, 69 Wash.2d 682, 420 P.2d 208 (1966); Charlotte Guyer & Assoc. v. Franklin Factors, 211 Cal.App.2d 690, 27 Cal.Rptr. 575 (1963); Sinclair v. Mack Trucks, Inc., 355 S.W.2d 563 (Tex.Civ.App.1962); In re Lico Mfg. Co., 201 F.Supp. 899 (D.C.Conn.1961). Where, however, a "service fee" or commission is not related to services performed, the extra charge has been considered as hidden interest. Industrial Bank of Washington, Inc. v. Page, 102 U.S.App.D.C. 33, 249 F.2d 938 (1957); Rosen v. Columbia Sav. & Loan Ass'n, 29 Misc.2d 329, 213 N.Y.S.2d 765 (1961); Williams v. Garrett, 208 Okl. 53, 254 P.2d 369 (1953); Smith v. Eason, 223 Ark. 747, 268 S.W.2d 389 (1954). See also D. & M. Development Co. v. Sherwood and Roberts, Inc., 93 Idaho 200, 457 P.2d 439 (1969), discussing a "committment fee."

The law seems well established that the face amount of a loan is not to be used in computing interest on the issue of applicability of usury laws when less than the face amount was actually loaned. One of the earliest cases reaching this result was Smith v. Parsons, 55 Minn. 520, 57 N.W. 311 (1893), in which the lender deducted a bonus from the face amount of a loan. In holding that the loan was usurious, the court stated that

"If [the bonus is] payable at the time of advancing the loan, it is for the purpose of determining what rate of interest the agreement reserves to the borrower, to be deducted as of that date from the amount of loan nominally agreed on, and the computation of interest made on the remainder. * * * [I]f it will result in reserving to the lender a rate greater than the rate permitted by law on the *amount to be actually retained by the borrower*, it is usury." (Emphasis added.) 57 N.W. at 311–312.

As for the method of computing the maximum legal interest, the court said:

"It is a mode of computation which defendants cannot complain of, to deduct the bonuses from the principal $20,000 as of the date of November 4, 1884, and calculate the interest on the remainder, $18,500, at the rate of 10 per cent, from that date to the maturity of the notes; add the $930 to that, and to their sum add the principal retained by the borrower, $18,500, aggregating $26,553, and compare that with what by the terms of the notes and mortgage the borrower was to repay to the lender, $20,000 principal, and $7,000 interest. The usurious character of the transaction is apparent." 57 N.W. at 312.

Similarly in Taylor v. Budd, 217 Cal. 262, 18 P.2d 333 (1933), the lender loaned $11,000 but withheld $110 interest in advance. In examining the transaction for usury the court stated:

"Second, *a note must be tested for usury with reference to the actual sum given by the lender to the borrower,* and not by the mere face of the note; and where, as here, the first month's interest has been collected in advance, 'the principal sum loaned will be held to be the amount of the loan less the interest or commission deducted in advance.' [citing cases] Plaintiffs here received from the lender at the time of the loan $11,000, less $110, the first month's interest, or $10,890, upon which they continually paid interest at the rate of 12 per cent. on $11,000, which was plainly usurious." 18 P.2d at 334. (Emphasis added.)

Another case in point is Ayvas v. Green, 57 So.2d 30 (Fla.1952), in which the lender loaned $2,700 at 6 per cent interest, but withheld certain charges which reduced the actual sum loaned to $2,285.82. In holding the loan usurious, the court pointed out that

"The maximum interest that could have been charged on a loan of $2,285.82 * * * at the lawful rate of 10 per cent would be $228.58 per annum, or $685.74 for the three-year period. Thus, by reserving a 'bonus' of $414.18 ($2700 minus $2285.82) and adding thereto interest at 6 per cent per annum for a three-year period on the principal amount of $2700, the lender has sought to 'reserve, charge or take' interest in the amount of $900.18, which is more than 10 per cent per annum [on $2285.82]." 57 So.2d at 33–34.

There are several other cases reaching the same result. Holcombe v. O'Sullivan, 93 A.2d 96 (D.C.Mun.App.1952); Mindlin v. Davis, 74 So.2d 789 (Fla.1954); Castleberry v. Weil, 142 Ark. 627, 219 S.W. 739 (1920); Penziner v. West Am. Fin. Co., 133 Cal.App.2d 578, 24 P.2d 501 (Cal.App. 1933).

If the Eagle Rock case is considered as using the face amount of the loan (without first deducting any amount determined to be interest), it would be contrary to the rule followed in the other states. Moreover, it should again be noted that in the Eagle Rock case the court there found the controversial items did not constitute interest, thus that portion of the opinion devoted to computing the maximum legal interest would be dicta. This latter portion of the Eagle Rock case should be recognized for what it is.

I am of the opinion that this instant action should be reversed and remanded to the trial court for reconsideration by it of findings of fact, conclusions of law and decree. In particular, the findings of fact are inconsistent when the trial court recognized in Finding VI that the respondent did perform services which inured to the benefit of the appellant, but did not make any determination of the value of such services, only finding that $1200 service fee was to be considered as "additional interest."