547 P.2d 526

Garth BUCHANAN and Jewel L. Buchanan, Plaintiffs-Appellants,

v.

DAIRY COWS, a partnership consisting of Wade W. Newton and Bill E. Mesker, Defendants-Respondents.

No. 11759.

Supreme Court of Idaho.

March 26, 1976.

Joseph M. Imhoff of Coughlan, Imhoff & Lynch, Cumer L. Green of Green & Frost, Boise, for plaintiffs-appellants.

John Magel of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for defendants-respondents.

DONALDSON, Justice.

The single issue before this Court is whether the three transactions between appellants, Garth and Jewel Buchanan, and respondent, Dairy Cows, a partnership, were credit sale transactions or loans in violation of the usury statutes.[1]

Appellants operate a dairy business and have done so for approximately thirty years in the Boise-Caldwell area. On three occasions, appellants increased the size of their dairy herd with the help of the respondents. Each transaction occurred, in the same way. Appellants selected the cows and ascertained the sellers' prices. Respondents would then pay the seller the agreed price for the cows and brand them with the respondents' Dairy Cows brand. Respondents then took pos-

---

1. "28–22–105. Maximum rate of interest.— Parties may agree in writing for the payment of any rate of interest, on money due or to become due on any contract, not to exceed the sum of ten per cent (10%) per annum * * *."

session and title to the cows and executed a "cow lease agreement" with appellants. Under the lease agreement a down payment was required of appellants and appellants thereafter made monthly payments for 45 months. At the end of this period, appellants were given the option of buying the animals at $1.00 a head. Under the lease agreement the appellants were required to pay a "time price differential" amounting to 12% annually on the contract cash sale price. In each case, the parties' contract price differed from the sales price as between respondents and the initial vendor by approximately 200%.

The lease agreements contained specific information regarding the financial aspects of the transactions, including the cash sale price, down payment, principal balance, and the time price differential and time sales price.

In addition, Dairy Cows agreed to cover 90% of the cost of replacing any cow which died during the term of the lease. Six cows under lease died and two were replaced by respondent under the death loss program; for the others appellants elected to receive credit against the final payments. Also Dairy Cows guaranteed that if a cow failed to freshen and produce milk from all four teats, Dairy Cows would replace the cow at no cost.

It is appellants' contention that these lease agreements were simply disguised loans which respondents were using to circumvent the state usury laws.

■ It is settled law that the usury statutes have no application to bona fide sales transactions. The rationale for this position was stated in *Bell v. Idaho Finance Co.,* 73 Idaho 560, 255 P.2d 715 (1953).

> "The owner may prefer a dollar in hand to a promise to pay two dollars and accordingly may fix one price for cash and another and highly disproportionate, even exorbitant, price for sale on time or credit." 73 Idaho at 565, 255 P.2d at 718.

*See also Smith v. Sherwood & Roberts, Spokane, Inc.,* 92 Idaho 248, 441 P.2d 158 (1968); *Peterson v. Philco Finance Corporation,* 91 Idaho 644, 428 P.2d 961 (1967). While the Court will not hesitate to look beyond the face of the instruments to determine whether the transaction involved is merely a device to prevent application of the usury statutes, the burden is the appellants' to show the instruments, valid on their face, are disguised loans, and this they have failed to do. *Meridian Bowling Lanes, Inc., v. Brown,* 90 Idaho 403, 412 P.2d 586 (1966).

■ Here, the facts show that appellants were not the necessitous debtors whom the usury statutes were designed to protect. *Bethke v. Idaho Savings & Loan Association,* 93 Idaho 410, 462 P.2d 503 (1969); *Meridian Bowling Lanes, Inc. v. Brown, supra.* Appellants' only purpose in obtaining the cows was to expand the dairy operation and thereby increase the operation's income. This was not a situation where appellants had no choice in the need to obtain financing, rather it was a calculated business decision to turn a thriving business operation into one of much greater proportions.

The burden of proof is on the party alleging usury and requires clear and convincing evidence. *Bethke v. Idaho Savings & Loan Association, supra; Meridian Bowling Lanes, Inc. v. Brown, supra.* The facts support the district court's finding that these were credit sale agreements and not loans of money. The lease agreements specify a "cash sale price", a "time sales price", and the "time price differential." Additionally, we note that respondent, as the owner-vendor of the cows, had the risk of covering 90% of the loss for the death of any cows during the term of the lease and to replace any cow which failed to give milk. To accept appellants' contention that these transactions were loans we must accept the unlikely situation of a "lender" agreeing to bear the risk of loss of the collateral for the loans.

The judgment of the district court is affirmed. Costs to respondents.

SHEPARD, J., and SCOGGIN and NORRIS, District Judges, concur.

McFADDEN, Justice (dissenting).

I am unable to join with the majority in their tour through the fantasy land of high finance. Unlike the majority, I cannot step through the looking glass to that land where a loan becomes a lease, finance charges become a time price differential, and interest rates are not interest rates simply because the lender, Dairy Cows, says so. See, Carroll, Lewis, *Through the Looking Glass.* Therefore, I must respectfully dissent from the opinion of the majority.

This court, in past cases, has identified two basic interrelated issues arising from a transaction alleged to be usurious: (1) whether the form of the transaction was merely a device to avoid the usury laws (See, *Milo Theater Corp. v. National Theater Supply,* 71 Idaho 435, 233 P.2d 425 (1951); *Freedman v. Hendershott,* 77 Idaho 213, 290 P.2d 738 (1955); *Meridian Bowling Lanes, Inc., v. Brown,* 90 Idaho 403, 412 P.2d 586 (1966); *Transportation Equipment Rentals, Inc. v. Ivie,* 96 Idaho 223, 526 P.2d 828 (1974)); (2) whether the transaction was a credit sale with a deferred sale price or a loan of money with interest charges (see, *Bell v. Idaho Finance Co.,* 73 Idaho 560, 255 P.2d 715 (1953); *Petersen v. Philco Finance Corp.,* 91 Idaho 644, 428 P.2d 961 (1967)). I think that, under the existing case law, the lease agreements at issue were merely devices to evade the usury laws. Moreover, I think that this court should abolish the distinction between a credit sale and a loan of money in transactions such as this.

The court, in examining a transaction to determine whether a usurious interest rate has been charged, is not bound by the form of the transaction; rather, the court should examine the facts and circumstances of the transaction to analyze the economic realities of the transaction. *Meridian Bowling Lanes, Inc. v. Brown,* 90 Idaho 403, 412 P.2d 586 (1966). This court should "not hesitate to pierce the veil of any such device or plan to evade the usury law". *Meridian Bowling Lanes, Inc. v. Brown,* 90 Idaho 403, 412, 412 P.2d 586, 591 (1966). Thus, we must delve into the sordid details of these transactions.

The first transaction (hereinafter the "Dilworth Transaction") involved the sale of eleven head of dairy cows owned by Harold Dilworth which Buchanan had been caring for. Dilworth and Buchanan had apparently entered into an agreement whereby Buchanan agreed to care for the cows for one year and to pay Dilworth $10 per head per month for each cow that was giving milk; in return, Dilworth agreed to allow Buchanan to keep the milk produced by the cows. Buchanan kept the cows for approximately one month; then Dilworth renounced the agreement telling Buchanan that he had to sell the cows. Buchanan offered to buy the cows and the two parties negotiated a price of $350 per head for eleven cows. Dilworth gave Buchanan one week to obtain financing for the purchase. Buchanan was unable to obtain a loan from the Farmers Home Administration or a commercial bank within the one week period and so he turned to Dairy Cows for the financing. Dairy Cows purchased the eleven cows from Dilworth at the price Buchanan negotiated—$350 per head, with a total price of $3,850. Prior to the passage of title to the cows to Dairy Cows, Dairy Cows entered into a forty-five month lease agreement with Buchanan. Buchanan paid $495 as an advance payment and promised to pay $165 per month for forty-five months. By the lease terms, Buchanan had an option to buy the cattle at the expiration of the lease for $1.00 per head; Dairy Cows guaranteed that each cow would freshen at all four teats and agreed to bear 90% of the replacement cost of any cows that died. As to costs,

"schedule 'B'" attached to the lease provided:

"THE TOTAL RENTAL PAYABLE HEREUNDER IS CALCULATED AS FOLLOWS:

| | | |
|---|---|---|
| 1. | Cash Sale Price | $6,468.00 |
| 2. | Down Payment | $ 495.00 |
| 3. | Principal Balance (item 1 minus item 2) | $5,973.00 |
| 4. | Finance Charge (including amount required to exercise option) | $1,463.00 |
| 5. | Time Balance (Item 3 and 4) | $7,436.00 |
| 6. | Time Sales Price (Item 2 and 5) | $7,931.00" |

"Schedule 'A'" listed the contract value of the cows as $7,920 ($720 per cow). A disclosure statement attached to the agreement listed the finance charge as $1,463 and the annual percentage rate as 12.00%. To secure its interest, Dairy Cows took an assignment of $165.00 per month from the proceeds of milk sold by Buchanan to Dairymen's Creamery Association, Inc. Dairy Cows assigned the "rental payments" due under the lease to Westinghouse Credit Corporation. Dairy Cows filed a financing statement for the cows and the assignment of proceeds from the sale of milk with the Ada County Recorder.

Dairy Cows did not take possession of the cows at any time. The lease agreement was dated October 27, 1969, whereas the bill of sale transferring title from Dilworth to Dairy Cows was dated November 12, 1969. The sole contact by Dairy Cows with the cattle appears to be an inspection and subsequent branding by Dairy Cows' agent.

An expert witness called by Buchanan testified that, based upon an original principal balance of $3,850 (the amount shown on the bill of sale), the effective interest rate on the Dilworth transaction would have been between 48 and 49½ percent annually if all payments were made according to the contract terms.

The other two transactions were almost identical and a detailed recitation of the facts of each transaction is not necessary for the purposes of this dissent. It should be noted that Wade Newton, a partner in Dairy Cows, testified that Dairy Cows did not maintain an inventory of cows for lease in Idaho but that Dairy Cows' agent referred its customers to interested sellers.

In my opinion, the lease agreements were merely devices to evade the usury laws. The case at bar is factually indistinguishable from *Freedman v. Hendershott*, 77 Idaho 213, 290 P.2d 738 (1955), wherein this court affirmed the trial court's finding that the transaction sued upon was usurious. In that case, defendants-respondents Nina Hendershott and Georgia Reynolds were purchasing a barroom and hotel under an escrow contract from the Weavers. The defendants, unable to meet the payments as required by the contract, entered into discussions with plaintiff-appellant Herman Freedman for financial assistance. The plaintiff agreed to "lend" the defendants $7,500 with $11,000 to be repaid in twenty-two monthly installments of $500 per month. The proceeds ($7,500) were distributed $3,000 to the defendants and $4,500 to the Weavers The Weavers gave a warranty deed and bill of sale for the hotel to the plaintiff. The plaintiff instituted the action alleging that the defendants were in default and seeking possession of the hotel; the defendants counterclaimed alleging that the contract was usurious. The plaintiff argued that the transaction was a sale of the hotel, not a loan. The trial court found that the transaction was not a bona fide sale but a loan at an usurious interest rate. This court affirmed:

"The evidence is substantial and sufficient to sustain the court's finding that the appellant made an usurious loan and that the purported sale and resale were merely a security device and a disguise for usury. It was a sale on paper only; plaintiff never took possession of the

property." 77 Idaho 213, 219, 290 P.2d 738, 741.

I think that the transaction at issue in the Freedman case and these transactions are indistinguishable. In this case, the trial court's finding that the transactions "were leases or sales and not loans of money to evade the usury laws" is contrary to the facts as presented by the record and thus should not be sustained by this court. For instance, in the Dilworth transaction, Buchanan negotiated the terms of the purchase with Dilworth and Dairy Cows in essence accepted the offer made by Dilworth to Buchanan. Dairy Cows purchased the cows for $3,850 and then leased the cows to Buchanan for a "cash sale price" of $6,468 and a "time purchase price" of $7,931. Dairy Cows did not take possession of the cows.

Moreover, I cannot agree with the majority's conclusion that these agreements were not subject to the usury law because they were credit sales, not loans. I think that it is time for this court to reexamine its holding that the usury laws are not applicable to credit sale contracts. This court, in *Petersen v. Philco Finance Corporation,* 91 Idaho 644, 428 P.2d 961 (1967), discussed the rationale for this holding:

> "The Idaho cases have consistently recognized the distinction between a loan of money and a time sale of property, and have held the latter are exempt from the state usury law. The rationale of those decisions has been that a seller may offer to sell at a designated price for cash or at a higher price for credit. Sale at a credit price will not constitute usury, although the difference between cash and credit price exceeds the lawful rate of interest that may be charged on a cash basis, so long as the transaction is not merely a form or device for defeating the usury laws. Consequently, the bona fide sale of property under a contract providing for the payment of the purchase price, in whole or in part, in the future, in one or more installments, is in no sense a loan; and the usury statute has no application to such sales. (citations omitted)." 91 Idaho 648, 428 P.2d 965.

The distinction between a credit sale and loan is without a foundation in logic or social policy. When an item is purchased on credit, the transaction presents two different cost elements—the cash price of the item and the cost of financing the purchase. If the cost of financing is covered by a loan, that is, if the buyer borrows the money and then pays a third party the cash price, the transaction is considered to be a loan and the cost of financing is limited to the amount specified in the applicable usury statute. However, if the cost of financing is borne by the seller under a credit sale arrangement, then the transaction is exempt from the usury laws. Thus, the choice of the method of financing determines the applicability of the usury laws. However, in a case such as this, we are discussing only one thing—the cost of financing—and so I do not think that this court should continue to draw the distinction. See *Transportation Equipment Rentals, Inc. v. Ivie,* 96 Idaho 223, 526 P.2d 828 (1974) (Bakes, J., dissenting); *Bell v. Idaho Finance Co.,* 73 Idaho 560, 255 P.2d 715 (1953) (Thomas and Taylor, JJ., dissenting).

In my opinion, the only logical rationale for a distinction between a loan and credit sale is found in the words of Lewis Carroll in his book, *Through the Looking Glass:*

> " 'When I use a word,' Humpty Dumpty said, in rather a scornful tone, 'It means just what I choose it to mean—neither more nor less.'
>
> " 'The question is,' said Alice, 'whether you can make words mean so many things.'
>
> " 'The question is,' said Humpty Dumpty, 'which is to be master—that's all.' "