IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Estate of | ) | No. 34315-4-III |
| | ) | |
| WILLARD F. JOHNSON | ) | |
| | ) | UNPUBLISHED OPINION |
| Deceased. | ) | |
| | ) | |

LAWRENCE-BERREY, A.C.J. — Colleen Wynecoop brought this action under the

Trust and Estate Dispute Resolution Act (TEDRA), chapter 11.96A RCW, seeking to

admit her purported photocopy of Willard Johnson's lost will to probate under the process

outlined in RCW 11.20.070. The trial court determined there were genuine issues of

material fact as to the authenticity of the purported photocopy and held an evidentiary

hearing. Following the hearing, the trial court determined that Ms. Wynecoop's

photocopy was authentic and admitted it to probate.

Mr. Johnson's five children appeal from the trial court's order. They argue

(1) TEDRA requires the initial hearing to be a final hearing on the merits and the trial

court did not have discretion to hold an evidentiary hearing, (2) Ms. Wynecoop's

testimony at the evidentiary hearing was barred by Washington's dead man's statute,

(3) Ms. Wynecoop failed to establish the will was validly executed, and (4) Ms. Wynecoop failed to prove the photocopy's authenticity. We disagree with these contentions and affirm.

## FACTS[1]

### A.   EXECUTION OF PURPORTED WILL AND MR. JOHNSON'S DEATH

In the early 1980s, Ms. Wynecoop and Mr. Johnson met one another and became friends. Around 1985, Mr. Johnson sold his house and moved in with Ms. Wynecoop. Eventually, they developed a romantic relationship.

During the time they lived together, Mr. Johnson worked as a truck driver, which required him to keep records of the miles he drove in each state. This generated a lot of paperwork. Ms. Wynecoop served as Mr. Johnson's secretary, preparing documents and then giving them to Mr. Johnson for signature. Mr. Johnson's signature was very unique and Ms. Wynecoop saw it hundreds of times.

---

[1] These facts are largely derived from the trial court's detailed factual findings in its order admitting Mr. Johnson's will to probate. Mr. Johnson's children challenge the trial court's legal rulings, but do not claim any of the trial court's findings are unsupported by substantial evidence. Thus, these findings are verities on appeal. *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

Mr. Johnson retained attorney Leo Daily for his trucking business, real estate transactions, and estate planning. Mr. Johnson frequently went to Mr. Daily's office. Ms. Wynecoop drove him there and would attend many of their meetings.

In the late 1980s, Mr. Johnson began experiencing increased pain. He underwent diagnostic surgery and was diagnosed with terminal cancer. He soon became bedridden and unable to move without extreme help. Ms. Wynecoop never charged Mr. Johnson for her caregiving services, nor did she ever charge him rent.

In May 1990, Ms. Wynecoop contacted Rod Burgess and Della Burgess. Mr. Burgess was the pastor of the church Mr. Johnson and Ms. Wynecoop attended, and Ms. Burgess was his wife. The Burgesses had baptized Ms. Wynecoop and had signed her baptismal certificate. Ms. Wynecoop asked the Burgesses to come to her house and witness the execution of Mr. Johnson's will.

On May 4, the Burgesses came to Ms. Wynecoop's house. Mr. Daily also arrived around that time. After the Burgesses and Mr. Daily arrived, Ms. Wynecoop took them into Mr. Johnson's bedroom, where she had already set up chairs around Mr. Johnson's bed. Ms. Wynecoop served them coffee, but then stayed out of the room.

Ms. Wynecoop was outside of the bedroom, but was able to observe what was happening inside. She saw that Mr. Daily had legal papers and a briefcase with him. She

3

also saw that Mr. Daily was reading and going over the legal forms with Mr. Johnson and the Burgesses. She later went back into the room to refresh everyone's coffee and saw the Burgesses passing papers back and forth. She saw them sign documents. She did not see Mr. Johnson or Mr. Daily sign any documents.

The Burgesses and Mr. Daily were in the bedroom for 30 to 45 minutes. After they left the bedroom, there were no papers left behind. The Burgesses did not leave with any papers. Mr. Daily left with his briefcase.

Roughly one week later, Ms. Wynecoop went to check her mail. An envelope addressed to Mr. Johnson had arrived from Mr. Daily's office. Ms. Wynecoop took the envelope to Mr. Johnson's bedroom and opened it for him. Inside was another envelope and a copy of Mr. Johnson's last will and testament, which was signed by Mr. Johnson, the Burgesses, and Mr. Daily. The will had a red "copy" stamp on the top right hand corner. Report of Proceedings (RP) at 137. There was a yellow sticky note on the envelope, which said, "'Copy—Original in George I. Diana's vault, W. 430 Indiana.'" RP at 141. Mr. Johnson told Ms. Wynecoop, "'I want you to read the will.'" RP at 152.

The letter also contained a durable power of attorney document, which was signed by both Mr. Johnson and Mr. Daily. On May 10, Ms. Wynecoop took this document and recorded it in the Stevens County Auditor's Office.

4

On June 18, 1990, Mr. Johnson passed away. His will appointed Ms. Wynecoop as the executrix and it directed for his estate to be settled without court intervention. The will granted Ms. Wynecoop authority to mortgage, lease, sell, and convey any of Mr. Johnson's property. After listing some specific bequests, the will left the residual estate to Ms. Wynecoop. The will stated the bequests to Ms. Wynecoop were for her help and assistance during his last troubled years, as well as for her attention to his medical problems to her own financial detriment. With a few exceptions, the will made no provision for Mr. Johnson's children.

In accordance with the will's instructions, Ms. Wynecoop distributed a John Deere swather, a Cadillac car, and a truck to Mr. Johnson's son Terry. Ms. Wynecoop distributed another truck to herself. Two of Mr. Johnson's trucks and two of his trailers were repossessed, and Ms. Wynecoop used what money remained in the bank to pay off his credit card debts. She used the death certificate and the copy of the will to transfer the vehicles' titles and to access Mr. Johnson's bank accounts. Because there were no other assets to administer, she never attempted to contact Mr. Daily. She showed the copy of the will to one of Mr. Johnson's sons, who threw it on the floor and stormed off.

Ms. Wynecoop knew that Mr. Johnson had mineral rights to a piece of land in North Dakota, which he acquired in 1977. Mr. Johnson had previously told her that he

5

wanted her to have the mineral rights and asked her to record them, although he informed her they had little value. His will did not mention mineral rights.

In March 1992, Ms. Wynecoop completed a "PROOF OF DEATH AND HEIRSHIP" affidavit. Clerk's Papers (CP) at 58. It stated that pursuant to Mr. Johnson's will, she was "entitled to the residue of the estate, including any mineral rights located in North Dakota." CP at 58. To document these rights in the event they ever became valuable, she filed and recorded this affidavit in North Dakota, along with a copy of Mr. Johnson's will. Ms. Wynecoop never told Mr. Johnson's children about the North Dakota property or that she had recorded these documents.

The Burgesses both later passed away.

B.    MR. DAILY'S LAW PRACTICE

Around 1987, Mr. Daily began renting office space from Spokane attorney George Diana. The two had independent practices but had regular contact with each other. They would witness each other's wills and notarize each other's documents. They shared a copy machine and a telephone number. Mr. Diana saw Mr. Daily's signature hundreds, if not thousands of times.

Mr. Diana was familiar with Mr. Daily's work product and office procedures. When Mr. Daily prepared wills, he would frequently go to the testator's home, or another

6

location, to execute the testator's will. He would bring the witnesses to the testator's home for the will's execution.

Mr. Daily also used a standard envelope for each will he prepared. When he executed wills in clients' homes, he would photocopy the original, stamp the copy with a large red "copy" stamp in the top right hand corner, and then give this copy to the client along with the formal envelope. RP at 102, 104. He would then keep the original and store it in a locked file box in his office.

In 1997, Mr. Diana moved his practice to a new building. Around this time, Mr. Daily was in the process of retiring. Mr. Diana brought Mr. Daily's files to his new building, except the files Mr. Daily was currently working on at the time. Many of Mr. Daily's former clients stopped by Mr. Diana's office to retrieve their files, and Mr. Diana kept a record of those who did. In 1999, Mr. Daily passed away.

C.     EVENTS LEADING TO TEDRA PETITION

In 2011, an oil company contacted Ms. Wynecoop. In August 2011, Ms. Wynecoop entered into an oil and gas lease with North Plains Energy, LLC, for the land in North Dakota. The lease described Ms. Wynecoop as "heir of Judith Thorstad Johnson," who was Mr. Johnson's mother. CP at 114; RP at 164. Ms. Wynecoop

7

received $32,400 through this lease. She did not tell Mr. Johnson's children about the lease.

The oil company began exploring to determine if any oil was on the property. Several years later, it asked Ms. Wynecoop to probate Mr. Johnson's estate. Ms. Wynecoop contacted Mr. Diana and requested the original of Mr. Johnson's last will and testament. Mr. Diana searched all of Mr. Daily's files in his possession, but was unable to locate the original of Mr. Johnson's will or any record that it had been retrieved. Mr. Diana responded to Ms. Wynecoop and informed her of this.

## PROCEDURE

In 2015, Ms. Wynecoop initiated this action to confirm her title to the mineral rights to the land in North Dakota. She filed a TEDRA petition to admit her photocopy of Mr. Johnson's will to probate. Mr. Johnson's five children, as his natural heirs, were notified of the petition. They objected to Ms. Wynecoop's petition and disputed the validity of the purported photocopy.

Both parties filed exhibits, declarations, and affidavits. Ms. Wynecoop filed an affidavit setting forth her relevant testimony. In response, Mr. Johnson's children argued that her affidavit was barred by Washington's dead man's statute, RCW 5.60.030. In her reply, Ms. Wynecoop asked the court to rule on specific objections to her affidavit. She

8

submitted a new affidavit, which itemized her prior affidavit into numbered sentences to aid the court in making rulings as to admissibility.

On September 2, 2015, the trial court held a hearing on Ms. Wynecoop's petition to determine whether it would admit the copy of the will to probate. At the hearing, the parties discussed the admissibility of various numbered sentences in Ms. Wynecoop's affidavit under the dead man's statute and hearsay rules. The trial court ruled on the admissibility of these statements—admitting some, but excluding others. The parties then presented argument on the merits of Ms. Wynecoop's petition and the court took the matter under advisement.

Following the hearing, the trial court issued a letter ruling. The trial court agreed with Ms. Wynecoop that satisfactory evidence established that the signatures on the photocopy were genuine, and that Mr. Johnson's purported will was properly executed. However, the court disagreed that Ms. Wynecoop had met her burden to prove the authenticity of the photocopy. The court ruled it would decide this issue "in one evidentiary proceeding, or trial." CP at 121.

Mr. Johnson's children then scheduled a hearing to present a proposed order denying Ms. Wynecoop's petition. Ms. Wynecoop objected, and argued that the court intended to hold an evidentiary hearing to decide the disputed factual issues. Mr.

9

Johnson's children responded, and argued that under RCW 11.96A.100(8), the court was required to resolve all factual and legal issues at the initial hearing unless otherwise requested by the parties.

At the beginning of the presentment hearing, the court advised Mr. Johnson's children that it did not deny Ms. Wynecoop's petition, but intended to hold an evidentiary hearing. The court advised that they had misinterpreted its letter. It clarified that it granted summary judgment for Ms. Wynecoop as to the validity and execution of the purported will. It stated it did so based on the notarized attestation clause, which was attached to the purported will.

However, the trial court concluded an evidentiary hearing was needed to resolve the issue of the purported will's authenticity. The court rejected Mr. Johnson's children's argument that it was required to resolve all factual and legal issues at the initial hearing. The court reasoned that RCW 11.96A.100(10) gave it discretion to hold an evidentiary hearing when genuine issues of material fact existed. The trial court entered an order consistent with these rulings.

At the evidentiary hearing, Ms. Wynecoop called Mr. Diana. Mr. Diana testified that Mr. Daily's signature was very distinctive, and he identified the signature at the

bottom of Mr. Johnson's purported will as Mr. Daily's. He also identified the signature on the durable power of attorney document as Mr. Daily's.

Mr. Diana further testified the red "copy" stamp at the top right corner of the purported will was consistent with Mr. Daily's work product. RP at 102. He testified the envelope was consistent with Mr. Daily's stationary. He noted that on this envelope, Mr. Daily had crossed out his previous office's address and had replaced it with the address of their shared building. He also noted that the sticky note on the envelope, which said "'Copy—Original in George Diana's vault,'" appeared to be Mr. Daily's legal assistant's handwriting. RP at 101.

Ms. Wynecoop also testified. She identified the signature at the bottom of the purported will as Mr. Johnson's. She described the nuances of how Mr. Johnson signed several letters. She identified the purported will and the envelope as the same documents Mr. Johnson received in the mail in May 1990. She also identified the signature on the durable power of attorney document as Mr. Johnson's.

Ms. Wynecoop identified the other signatures on the purported will as belonging to the Burgesses. She recognized both of their signatures, as they had signed her baptismal certificate.

Following the evidentiary hearing, the trial court determined that the photocopy Ms. Wynecoop filed with her TEDRA petition was an authentic copy of Mr. Johnson's last will and testament. First, it reasoned that Ms. Wynecoop was a witness with knowledge, as she had opened the letter that contained a copy of the will. Second, the court reasoned that Mr. Diana and Ms. Wynecoop provided clear lay opinions as to handwriting and were able to identify Mr. Johnson's and Mr. Daily's signatures on the will, which also matched those on the durable power of attorney document. Third, the court reasoned that the will had a number of distinctive characteristics. These included its consistent type throughout, its coherent sequence, as well as the envelope, handwritten note, and red "copy" stamp. CP at 187. The court noted that the will's bequests were mostly consistent with how Ms. Wynecoop distributed Mr. Johnson's assets.

Finally, the court noted that there was no evidence the will's contents were altered. It reasoned that the purported will was identical to the copy of Mr. Johnson's will that was recorded in North Dakota in 1992, and if someone interested in the mineral rights had altered the will, he or she likely would have altered it by expressly listing the mineral rights in the recorded copy. The fact that those rights were not expressly listed supported its finding that the recorded document was not an altered copy.

12

Because Ms. Wynecoop had established the authenticity of the copy of Mr. Johnson's will, the court concluded its contents were proved by clear, cogent, and convincing evidence. The court admitted the will to probate and entered formal findings of fact and conclusions of law. Mr. Johnson's children appeal.

## ANALYSIS

Mr. Johnson's children argue, citing *In re Estate of Black*, 153 Wn.2d 152, 102 P.3d 796 (2004), that this court should review all issues in this case de novo.

In *Black*, the trial court granted the petitioner's summary judgment motion to admit the lost will to probate based solely on the affidavits. *Id.* at 158-59. Thus, the *Black* court reviewed all issues de novo, engaging in the same inquiry as the trial court. *Id.* at 160-61. Here, the trial court granted summary judgment based on the affidavits on one substantive issue in the case—the validity and execution of the will. Similarly, the trial court generally made its evidentiary rulings relating to the dead man's statute on Ms. Wynecoop's affidavits at the initial hearing. Thus, this court reviews each of these rulings de novo. *See In re Estate of Black*, 116 Wn. App. 476, 486, 66 P.3d 670 (2003), *aff'd on other grounds*, 153 Wn.2d 152; *Estate of Lennon v. Lennon*, 108 Wn. App. 167, 174, 29 P.3d 1258 (2001).

13

However, the trial court determined that a genuine issue of material fact existed as to the second substantive issue in this case—whether Ms. Wynecoop adequately authenticated the photocopy of the purported will. For this reason, the trial court held an evidentiary hearing to resolve the factual issues. In doing so, the trial court necessarily weighed evidence and assessed the demeanor and credibility of the witnesses. Accordingly, this court reviews the trial court's findings of fact to determine if they are supported by substantial evidence in the record. *In re Estate of Miller*, 134 Wn. App. 885, 890, 143 P.3d 315 (2006). If so, this court then determines whether those findings support the trial court's conclusions of law. *Id.*

A.    THE TRIAL COURT HAD DISCRETION TO HOLD AN EVIDENTIARY HEARING

Mr. Johnson's children argue the trial court erred when it held an evidentiary hearing on the issue of the authenticity of the purported will. They rely on RCW 11.96A.100(8), which requires that "the initial hearing must be a hearing on the merits to resolve all issues of fact and all issues of law." They argue that this provision required the trial court to dismiss Ms. Wynecoop's petition if it determined she had not met her evidentiary burden, and that it had no discretion to order an evidentiary hearing to resolve disputed factual issues.

14

TEDRA is a "'grant of plenary powers to the trial court.'" *In re Estates of Jones*, 170 Wn. App. 594, 604, 287 P.3d 610 (2012) (quoting *In re Irrevocable Trust of McKean*, 144 Wn. App. 333, 343, 183 P.3d 317 (2008)). It gives the trial court "full and ample power and authority . . . to administer and settle . . . [a]ll matters concerning the estates and assets of incapacitated, missing, and deceased persons" in accordance with Title 11 RCW. RCW 11.96A.020(1)(a). TEDRA also provides:

> If this title should in any case or under any circumstance be inapplicable, insufficient, or doubtful with reference to the administration and settlement of the matters listed in subsection (1) of this section, *the court nevertheless has full power and authority to proceed with such administration and settlement in any manner and way that to the court seems right and proper, all to the end that the matters be expeditiously administered and settled by the court.*

RCW 11.96A.020(2) (emphasis added). This court reviews issues of law and statutory construction de novo. *Estate of Jones*, 152 Wn.2d at 8-9. However, in light of the legislature's broad grant of authority to the trial court under TEDRA, this court reviews procedural rulings for an abuse of discretion and accords significant deference to trial court decisions in TEDRA proceedings. *See In re Estate of Fitzgerald*, 172 Wn. App. 437, 448, 294 P.3d 720 (2012).

RCW 11.96A.100 outlines the general procedural rules for TEDRA petitions. It provides in relevant part:

15

> Unless rules of court require or this title provides otherwise, or unless a court orders otherwise:
>
> . . . .
>
> (8) Unless requested otherwise by a party in a petition or answer, the initial hearing must be a hearing on the merits to resolve all issues of fact and all issues of law;
>
> . . . .
>
> (10) If the initial hearing is not a hearing on the merits or does not result in a resolution of all issues of fact and all issues of law, the court may enter any order it deems appropriate, which order may (a) resolve such issues as it deems proper, (b) determine the scope of discovery, and (c) set a schedule for further proceedings for the prompt resolution of the matter.

RCW 11.96A.100.

Mr. Johnson's children argue that subsection (8) requires the initial hearing to be a final hearing on the merits. Thus, they argue the trial court was required to make a final decision after the initial hearing—either granting or dismissing Ms. Wynecoop's petition—and it erred in holding the later evidentiary hearing. They argue that interpreting the statute otherwise would render subsection (8) meaningless and superfluous.

However, this interpretation of RCW 11.96A.100 reads words into the statute that are not there. The statute does not require the initial hearing to be a *final* hearing on the merits. Rather, "[i]f the initial hearing . . . does not result in a resolution of all issues of fact and all issues of law, the court may enter any order it deems appropriate," which

16

includes "resolv[ing] such issues as it deems proper," and ordering "further proceedings for the prompt resolution of the matter." RCW 11.96A.100(10).

Here, the trial court followed this precise process. In accordance with subsection (8), the initial hearing *was* a hearing on the merits. The goal was to resolve all the factual and legal issues. However, the trial court determined that a genuine issue of material fact remained as to the authenticity of the will. The trial court then exercised its discretion to resolve this issue as it deemed proper, which involved holding an evidentiary hearing. This process is expressly authorized by RCW 11.96A.100(10).

B. THE TRIAL COURT DID NOT ERR IN APPLYING THE DEAD MAN'S STATUTE

Mr. Johnson's children argue the trial court erred when it allowed Ms. Wynecoop to testify at the evidentiary hearing. They argue her testimony was barred by Washington's dead man's statute.

The dead man's statute, RCW 5.60.030, applies when a legal representative of a deceased person is an adverse party in a lawsuit. The statute prohibits an "interested party" from testifying about any "transaction" he or she had with the deceased or any statements the deceased made to him or her. RCW 5.60.030. A person is an "interested party" when he or she stands to gain or lose from the action in question. *In re Estate of Shaughnessy*, 97 Wn.2d 652, 656, 648 P.2d 427 (1982).

17

Importantly, "[n]ot all testimony by a party in interest about the words or acts of the decedent is prohibited." *Bentzen v. Demmons*, 68 Wn. App. 339, 344, 842 P.2d 1015 (1993). The statute only prohibits testimony about words or acts involving a "transaction" between the interested party and the decedent. *Id.* A "transaction" under the dead man's statute is broadly defined as

> "the doing or performing of some business between parties, or the management of any affair. To be a transaction in such a case, the matter concerning which the testimony is given must involve some act *by and between the parties* for the benefit or detriment of one or both of the parties. It has been held, and properly so, that the test of transactions with [the] deceased . . . is whether [the] deceased, if living, could contradict the witness of his own knowledge."

*Id.* at 344 (emphasis added) (alterations in original) (quoting *In re Estate of Wind*, 27 Wn.2d 421, 426, 178 P.2d 731 (1947)).

Thus, an interested party can still testify about a range of matters, as long as they do not concern a specific transaction with the decedent or reveal a statement made by the decedent. *Kellar v. Estate of Kellar*, 172 Wn. App. 562, 574-75, 291 P.3d 906 (2012). For example, an interested party may testify about his or her own acts, feelings, or impressions. *Id.* An interested party may also testify about his or her transactions with third parties. *Peoples Nat'l Bank of Wash. v. Nat'l Bank of Commerce of Seattle*, 69 Wn.2d 682, 690, 420 P.2d 208 (1966).

18

Additionally, the statute "does not exclude evidence as to who was or was not present at the time of the transaction." *Martin v. Shaen*, 26 Wn.2d 346, 352, 173 P.2d 968 (1946). Rather, it applies when there is a personal transaction *between* the interested party and the deceased, and the testimony "tends to show either what did take place between the parties or what did not." *Id.* The statute also does not prohibit an interested party from identifying the handwriting of the deceased, because "'such identification is not a transaction with the deceased or statement made by him.'" *Jewett v. Budwick*, 145 Wash. 405, 406, 260 P. 247 (1927) (quoting *Goldsworthy v. Oliver*, 93 Wash. 67, 69, 160 P. 4 (1916)).

It is undisputed that Ms. Wynecoop is an interested party. Thus, Mr. Johnson's children argue she "should not have been permitted to offer any substantive testimony with respect to Mr. Johnson's purported will." Br. of Appellant at 15. They argue Ms. Wynecoop was improperly permitted to testify that Mr. Daily and the Burgesses arrived at her home, reviewed and signed documents, and that all of this was done so Mr. Johnson could execute a will. They argue if Mr. Johnson were alive, he would be able to contradict all of these statements, thus making them "transactions" under the dead man's statute.

19

The flaw in this argument is that, although Ms. Wynecoop testified about various interactions between Mr. Johnson, Mr. Daily, and the Burgesses, the trial court never permitted her to testify about any transactions between *her and Mr. Johnson.* She never described any business or act "by and between" them that related to the will.[2] *Bentzen*, 68 Wn. App. at 344 (quoting *Wind*, 27 Wn.2d at 426). Rather, she described her own acts, impressions, and transactions with third parties. She described who was present when the will was executed. None of this testimony was barred by the dead man's statute.

Mr. Johnson's children argue that because Mr. Johnson could have contradicted Ms. Wynecoop's version of events if he were alive, the events she described were therefore "transactions." This is not how Washington courts have construed the statute. Rather, the statute only prohibits testimony relating to transactions *by and between* the interested party and the decedent.

Mr. Johnson's children rely on *Estate of Shaughnessy*, 97 Wn.2d 652. In that case, the testator's attorney drafted the will, and the will made several specific bequests to that attorney. *Id.* at 653. The will was lost and the attorney filed a petition to admit the lost will to probate. *Id.* In the proceedings, the attorney testified about the will's contents, despite the fact that he was a beneficiary. *Id.* Our Supreme Court held that the attorney's

_____

[2] Although she testified that Mr. Johnson told her, "'I want you to read the will,'"

drafting of the will was a "transaction" by and between the two. *Id.* at 657. This was because the testator had to personally communicate instructions to the attorney for the attorney to draft the will. *Id.* This case, however, is factually distinguishable. In *Estate of Shaughnessy*, the interested party's proffered testimony concerned communications and acts by and between him and the decedent. Whereas here, Ms. Wynecoop testified about events unrelated to the will—such as her relationship with Mr. Johnson—what she saw and heard concerning the will's execution, her administration of Mr. Johnson's estate, and her actions of later recording her affidavit and copy of the will in North Dakota. None of her testimony—with the exception of Mr. Johnson directing her to read his will— included communications or acts by and between her and Mr. Johnson concerning the will. Accordingly, the trial court did not err in admitting her testimony.

C.    THE WILL WAS VALIDLY EXECUTED

Mr. Johnson's children argue Ms. Wynecoop failed to establish that the will was validly executed. They acknowledge Ms. Wynecoop produced a notarized attestation clause. However, they argue she needed to present an *original* attestation clause, and a copy was insufficient. They also argue Ms. Wynecoop could not validate the signatures on the will because she was not present when the will was executed.

---

Mr. Johnson's children waived the dead man's statute as to this transaction. RP at 152.

21

RCW 11.12.020(1) outlines the requirements for a validly executed will. It requires three basic formalities:

> Every will shall be [1] in writing [2] signed by the testator or by some other person under the testator's direction in the testator's presence, and shall be [3] attested by two or more competent witnesses, by [a] subscribing their names to the will, or by [b] signing an affidavit that complies with RCW 11.20.020(2), while in the presence of the testator and at the testator's direction or request.

RCW 11.12.020(1).

For an affidavit to comply with RCW 11.20.020(2), the attesting witnesses must make it "before any person authorized to administer oaths, stating such facts as they would be required to testify to in court to prove such will." The affidavit "may be written on the will or may be attached to the will or to a photographic copy of the will." RCW 11.20.020(2). A signed attestation clause provides prima facie evidence that the will was signed by two witnesses in the testator's presence and at his or her direction. *Black*, 153 Wn.2d at 165; *In re Estate of Campbell*, 47 Wn.2d 610, 615-16, 288 P.2d 852 (1955).

Here, Ms. Wynecoop proved that Mr. Johnson's will met all three of the requirements for a validly executed will, as outlined in RCW 11.12.020. First, the will was in writing. Second, she proved it was signed by Mr. Johnson. She saw his signature hundreds of times while serving as his secretary and identified the signature on the bottom of the will as his. Although Ms. Wynecoop did not see Mr. Johnson actually sign

22

the will, she recognized his handwriting and was able to describe its unique characteristics. She was also nearby when he executed his will. Ample circumstantial evidence supports that the signature on the will is Mr. Johnson's.

Finally, Ms. Wynecoop proved the third requirement—that the will was attested by two competent witnesses. She testified she had invited the Burgesses over to witness the will's execution. She was familiar with their handwriting and was able to identify their signatures, as they both had signed her baptismal certificate. She proved this requirement under both alternatives outlined in RCW 11.12.020. She proved it under the first alternative because both Rod and Della Burgess subscribed their names to the bottom of the actual will. She proved it under the second alternative because the affidavit of attesting witnesses, notarized by Leo Daily, provides prima facie evidence that the will was signed by the Burgesses in Mr. Johnson's presence and at his direction. *Black*, 153 Wn.2d at 165.

Mr. Johnson's children argue that Ms. Wynecoop needed to present an *original* attestation clause, and that the photocopy she provided was insufficient. However, this argument conflates the requirements of valid execution and authentication. Mr. Johnson's children acknowledge that before any question about the will's authenticity can

23

be answered, "the Court must first conclude that the petitioner established that a valid will was, in fact, executed." Br. of Appellants at 20.

Here, the copies of both the will itself and the attestation clause demonstrate the will was validly executed. Requiring original copies of these documents would be senseless in a lost wills case, given that the reason for the proceeding is that the original will is lost. We conclude Ms. Wynecoop established that Mr. Johnson's will was validly executed and, by so concluding, can next address the issue of the will's authenticity.

D.     THE WILL IS AUTHENTIC

Mr. Johnson's children argue the trial court erred when it ruled that the photocopy of Mr. Johnson's will was an authentic copy of the original.

RCW 11.20.070 governs the admission of lost wills to probate. Once the court determines the lost will was validly executed, the statute then requires the petitioner to prove its provisions "by clear, cogent, and convincing evidence, consisting at least in part of a witness to either [1] its contents or [2] the authenticity of a copy of the will." RCW 11.20.070(2).

Because Mr. Johnson, the Burgesses, and Mr. Daily were all deceased, Ms. Wynecoop could not prove the provisions of the will through a witness to its contents.

24

Thus, she was required to establish that the photocopy was an authentic replica of the original will.

ER 901(a) provides that the requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Generally, this standard is met "if the proponent shows enough proof for a reasonable fact finder to find in favor of authenticity." *State v. Payne*, 117 Wn. App. 99, 108, 69 P.3d 889 (2003). However, in the lost will context, if the court finds the copy of the will is authentic under ER 901, then the petitioner has proved the provisions of the will. For this reason, we deem it proper to apply the clear, cogent, and convincing standard of proof to the authenticity requirement. We review a trial court's decision on authenticity for an abuse of discretion. *Payne*, 117 Wn. App. at 110.

Here, Mr. Johnson's children do not argue that any of the trial court's factual findings are unsupported by substantial evidence. Rather, they argue that these findings do not support the court's legal conclusion that the photocopy met the standard for authenticity under ER 901(a). We disagree.

The trial court determined that the copy was authentic under ER 901(b)(1), ER 901(b)(2), and ER 901(b)(4). These provisions allow for authentication based on testimony of a witness with knowledge, nonexpert opinions on the genuineness of

25

handwriting, and the document's "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." ER 901(b)(1)-(2), (4).

The trial court's factual findings support its conclusion that the will was authentic. Mr. Johnson executed his will with Mr. Daily and the Burgesses on May 4, 1990. Shortly after, Mr. Johnson received a copy of the will from Mr. Daily in the mail. Mr. Johnson asked Ms. Wynecoop to read it. The will featured signatures of everyone who was at the house on May 4, and came in a distinctive envelope with Mr. Daily's and his legal assistant's markings on it. The will had a red "copy" stamp across the top. Mr. Diana recognized all of this as Mr. Daily's work product, and also recognized Mr. Daily's signature. Ms. Wynecoop recognized Mr. Johnson's and the Burgesses' signatures on the will.

Importantly, this copy of the will was identical to the copy that was recorded in North Dakota in 1992—two decades before Ms. Wynecoop learned that the mineral rights were valuable. The recorded copy did not mention mineral rights, which it likely would have if Ms. Wynecoop had altered it. Moreover, Ms. Wynecoop distributed Mr. Johnson's property consistently with the will's provisions.

26

In arguing that Ms. Wynecoop failed to prove the will's authenticity, Mr.

Johnson's children rely on *Payne*, 117 Wn. App. 99. In *Payne*, the trial court found that

the State's proffered evidence did *not* meet the authenticity requirements of ER 901. *Id.*

at 107. The crux of the *Payne* court's holding was that it would defer to the trial court's

determination, even if some evidence supported the opposite conclusion. *Id.* at 110.

Here, the trial court took all of the facts noted above into account and found that

Ms. Wynecoop had established by clear, cogent, and convincing evidence that the

photocopy was an authentic copy of Mr. Johnson's original will. Similar to *Payne*, we

defer to the trial court's findings of authenticity, and conclude that the court's legal

conclusions flow from its findings.

E.     ATTORNEY FEES

Both parties request an award of attorney fees on appeal pursuant to

RCW 11.96A.150. This statute gives an appellate court discretion in all proceedings

under Title 11 RCW to award costs and reasonable attorney fees to any party, "to

be paid in such amount and in such manner as the court determines to be equitable."

RCW 11.96A.150(1). The award may come from any party to the proceedings, from the

estate, or from any nonprobate asset involved in the case. *Id.* In exercising its discretion,

"the court may consider any and all factors that it deems to be relevant and appropriate,

No. 34315-4-III
*In re Estate of Johnson*

which factors may but need not include whether the litigation benefits the estate or trust involved." *Id.*

We exercise our discretion and award reasonable attorney fees on appeal to Ms. Wynecoop, to be paid jointly and severally by Mr. Johnson's children. After the evidence was presented at the hearing, it should have been evident to Mr. Johnson's children that Ms. Wynecoop's photocopy was a true copy of their father's will. Although they were entitled to make their technical arguments on appeal, the truth of Ms. Wyncoop's claim could hardly be doubted.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Siddoway, L.

Pennell, J.

28